NOT ORIGINAL DOCUMENT
10/07/2020 08:18 AM
bmirenzenb1148

FILED
KENTON CIRCUIT/DISTRICT COURT
OCT 06 2020
JOHN C. MIDDLETON
BY ________ D.C.

**COMMONWEALTH OF KENTUCKY**
**KENTON COUNTY**
**CIRCUIT CIVIL COURT**

| | | |
|---|---|---|
| **LIGHTHOUSE TRANSPORTATION SERVICES, LLC**<br>**P.O. Box 188067**<br>**Erlanger, Kentucky 41018** | : | **Case No.** 20-CI-1381 |
| | : | **Judge** 3 |
| **Plaintiff,** | : | |
| **v.** | : | |
| | : | **COMPLAINT** |
| **US MELON, LLC**<br>**c/o Sheehyung Sung**<br>**9005 147th Road**<br>**Live Oak, Florida 32060** | : | |
| **Serve Also:** | : | |
| **US MELON, LLC**<br>**1620 West Oakland Blvd.**<br>**Suite 404**<br>**Oakland Park, FL 33311** | : | |
| **And** | : | |
| **SHEEHYUNG SUNG**<br>**9005 147th Road**<br>**Live Oak, Florida 32060** | : | |
| **And** | : | |
| **KEN KODISH**<br>**9005 147th Road**<br>**Live Oak, Florida 32060** | : | |
| **Defendants.** | : | |

Plaintiff Lighthouse Transportation Services, LLC, ("Plaintiff"), through counsel, for its Complaint against Defendants US Melon, LLC, ("US Melon"), Sheehyung Sung ("Sung"), and Ken Kodish ("Kodish") states as follows:

EXHIBIT "A"

NOT ORIGINAL DOCUMENT
10/07/2020 09:32:18 AM
bmrenzenbrink

## PARTIES AND JURISDICTION

1. Plaintiff is a Kentucky limited liability company with its principal place of business located in Kenton County, Kentucky. Plaintiff is a freight broker that provides nationwide logistics solutions.

2. Defendant US Melon is a Florida limited liability company with its principal place of business located at 1620 West Oakland Park Boulevard, Suite 404, Oakland Park, Florida 33311.

3. Defendant Sung is an individual who resides in Florida and, at all times relevant, was or is a member and manager of US Melon.

4. Defendant Kodish is an individual who resides in Florida and, at all times relevant, was or is a member of US Melon.

5. At all times relevant herein, Defendants established or maintained a business relationship with Plaintiff in this judicial district, thereby subjecting itself to the jurisdiction of this Court.

6. This Court has personal jurisdiction over all parties due to the injury caused by Defendants upon Plaintiff.

7. This Court is the proper venue under Kentucky Revised Statutes Section 452.

## STATEMENT OF FACTS

8. On or about April 16, 2019, Plaintiff and US Melon entered into a "Subscription Agreement." A copy of the Subscription Agreement is attached hereto as Plaintiff's Exhibit A.

9. The Subscription Agreement provides that Plaintiff would purchase 10 membership units in US Melon in exchange for Plaintiff providing (i) $125,000 USD, (ii) a line of credit to US

NOT ORIGINAL DOCUMENT
10/07/2020 09:32:18 AM
bmrenzenbrink

Melon for $300,000.00 for general business purposes, and (iii) a line of credit to US Melon for $500,000 for transportation business (a transaction generally referred to herein as "the Offering").

10. Pursuant to the terms of the Subscription Agreement, Plaintiff furnished US Melon with the $125,000 and lines of credit, and Plaintiff received 10 membership units in US Melon.

11. The Subscription Agreement, under Article III, Section (a), states "The Company has virtually no financial or operating history."

12. Additionally, under Article III, the Subscription Agreement states that the Offering was neither registered under the Securities Act of 1933 (the "Act") or with the State of Florida, as the Offering involved securities covered by Regulation D, Rule 506 specifically.

13. The Offering was likewise not registered with the Commonwealth of Kentucky.

14. Upon information and belief (including an exhaustive search of EDGAR and each state's securities registrations), neither a Form D, nor any type of notice filing has been filed relating to the Offering.

15. All or substantially all communications relevant to the Offering made to Lighthouse were made by either Sung or Kodish and Sung and Kodish were the points of contact for US Melon attempting to procure investment for US Melon from Lighthouse and others.

16. No "Accredited Investor Questionnaire" was requested by US Melon, Sung, or Kodish. There was no inquiry into whether Lighthouse and its Members qualified as an "accredited investor" (as defined by Rule 501, Regulation D of the Act).

17. Upon demand for financials, Lighthouse was supplied with a simple business plan, a pro forma revenue and expense model titled "Model Assumptions," and an unaudited balance sheet (the "Offering Documents" attached hereto as Exhibit B).

NOT ORIGINAL DOCUMENT
10/07/2020 09:32:18 AM
bmrenzenbrink

18. Upon information and belief, the documents prepared for the Offering to Lighthouse were created by either Sung or Kodish or the two of them working cooperatively.

19. There were no risk factors or material disclosures made to Lighthouse whatsoever about the speculative nature of the Offering provided in the Offering Documentation.

20. There were no material disclosures made about the speculative nature of agricultural investments provided in the Offering Documentation.

21. There were no material disclosures about the existence of any claims, liabilities, or potential risks under the Perishable Agricultural Commodities Act ("PACA") or the possibility that the monies provided might be subject to a PACA claim or PACA trust at some time in the future in the Offering Documents.

22. The balance sheet included with the Offering Documents stated total liabilities of $20,617.52 as of April 9, 2019.

23. As of April 9, 2019, US Melon had in excess of $300,000 in concealed or undisclosed debts (including undocumented loans that Sung represented were not attributable to US Melon).

24. Upon an inquiry by Lighthouse as to the location or use of funds contributed by other Members of US Melon, Sung and Kodish represented that the other Members had personally guaranteed debts that would not be attributable to US Melon or Lighthouse's investment or status as creditor. That representation was false, Sung and Kodish knew it was false, and Sung and Kodish made these material representations with the intent that it would induce Lighthouse to invest in US Melon.

25. Lighthouse reasonably relied upon the false and material misrepresentations of Sung, Kodish, and US Melon including: (i) the concealment of hundreds of thousands of dollars

NOT ORIGINAL DOCUMENT
10/07/2020 09:32:18 AM
bmrenzenbrink

in undocumented debts, (ii) the misrepresentations about the use of other Members' capital contributions, (iii) the many misrepresentations contained in the Offering Documents (including the concealment of hundreds of thousands of dollars of debt from the balance sheet), and (iv) the misrepresentation that US Melon had no financial or operating history.

26. In reasonable reliance upon those intentional misrepresentations, Lighthouse signed the Subscription Agreement and participated in the Offering, investing $125,000 in cash and contributing $800,000 in credit for 10% of a Company that was effectively insolvent and in financial distress as of April 16, 2019.

27. On or about July 16, 2020, the Members of US Melon signed a Second Amended and Restated Operating Agreement for US Melon, LLC. A copy of the Operating Agreement is attached hereto as Plaintiff's Exhibit C.

28. The Second Amended Operating Agreement named Joseph Myers, President of Lighthouse Transportation Services and Sheehyung Sung as the two Managers of US Melon. *See* Plaintiff's Exhibit B at ¶ 7.1.

**COUNT ONE – FRAUD BY OMISSION/MISREPRESENTATION**

**(Against US Melon, Sung, and Kodish)**

29. Plaintiff incorporates by reference the previous paragraphs as if fully restated herein.

30. The Subscription Agreement entered into between Plaintiff and US Melon provided that US Melon "has virtually no financial or operating history." *See* Plaintiff's Exhibit A at Article III(a).

NOT ORIGINAL DOCUMENT
10/07/2020 09:32:18 AM
bmrenzenbrink

31. However, US Melon, Sung, and Kodish concealed and misrepresented material facts regarding several monetary advancements made to or on behalf of MSM Groves, Inc. prior to Plaintiff entering into the Subscription Agreement *See* Plaintiff's Exhibit D.

32. In total, US Melon authorized and provided monetary advancements to MSM Groves, Inc. totaling $333,322.06. *See* Plaintiff's Exhibit D.

33. These monetary advancements made by US Melon to MSM Groves were made without a written agreement in place between US Melon and MSM Groves.

34. When asked, Sung and/or Kodish represented that the Members of US Melon had personally taken on debts that would not be enforceable against US Melon or Lighthouse's investment therein. That representation was false.

35. US Melon, Sung, and Kodish, in representing to the Plaintiff that US Melon had virtually no financial or operating history, knew these representations were false, yet Defendants made these representations with reckless disregard for the truth of the representation.

36. US Melon, Sung, and Kodish's misrepresentations relating to US Melon's financial or operating history was made with the intent to induce the Plaintiff into entering into the Subscription Agreement and contributing capital to US Melon.

37. Plaintiff reasonably and materially relied on these fraudulent misrepresentations by US Melon, Sung, and Kodish in deciding whether to enter into the Subscription Agreement and contribute capital.

38. Shortly after entering into the Subscription Agreement with US Melon, Plaintiff learned of the significant monetary advancements made to MSM Groves from US Melon.

NOT ORIGINAL DOCUMENT
10/07/2020 09:32:18 AM
bmrenzenbrink

39. However, it was never disclosed until a much later date to Plaintiff by US Melon that these monetary advancements to MSM Groves were made without a written contract in place between US Melon and MSM Groves.

40. When MSM Groves abruptly terminated the agreement with US Melon, US Melon was left with little or no recourse due to the lack of a written contract between MSM Groves and US Melon.

41. As a direct and proximate cause of US Melon, Sung, and Kodish's fraudulent misrepresentations, Plaintiff has suffered significant financial injury and is entitled to damages in excess of the jurisdictional minimum of this Court.

42. US Melon, Sung, and Kodish acted fraudulently, purposefully, and with malice with the specific intention of defrauding Plaintiff as to the actual value of ten membership units in US Melon and procuring Plaintiff's investment of capital therein, justifying an award of punitive damages against US Melon, Sung, and Kodish and Plaintiff's attorneys' fees.

**COUNT TWO – FRADULENT INDUCEMENT**

**(Against US Melon, Sung, and Kodish)**

43. Plaintiff incorporates by reference the previous paragraphs as if fully restated herein.

44. In materially relying on US Melon, Sung, and Kodish's fraudulent omissions and misrepresentations with respect to US Melon's financial or operating history, Plaintiff was fraudulently induced into entering into a Subscription Agreement with US Melon and investing capital therein.

NOT ORIGINAL DOCUMENT
10/07/2020 09:32:18 AM
bmrenzenbrink

45. Specifically, Plaintiff was fraudulently induced to purchase an artificially inflated and overvalued ten membership units of US Melon and to extend credit in support thereof based on the fraudulently misrepresented financial and operating history of US Melon, Sung, and Kodish.

46. As a direct and proximate result of US Melon, Sung, and Kodish's fraudulent misrepresentations regarding Defendants' financial and operating histories, Plaintiff has suffered significant financial injury due to the fraudulent inducement of US Melon to enter into the Subscription Agreement and procuring Plaintiff's investment of capital therein, and Plaintiff is entitled to damages in excess of the jurisdictional minimum of this Court.

47. US Melon, Sung, and Kodish acted fraudulently, purposefully, and with malice with the specific intention of defrauding Plaintiff as to the actual value of the ten membership units in US Melon and procuring Plaintiff's investment of capital therein, justifying an award of punitive damages against US Melon, Sung, and Kodish and Plaintiff's attorneys' fees.

**COUNT THREE – BREACH/VIOLATION OF KENTUCKY BLUE SKY LAWS**

**(Against US Melon, Sung, and Kodish)**

48. Plaintiff incorporates by reference the previous paragraphs as if fully restated herein.

49. US Melon did not register the Offering with the SEC, nor the Commonwealth of Kentucky.

50. The Offering was not a covered transaction under Rule 506 of Regulation D of the Act.

51. There was no good faith attempt to seek exemption under Rule 506 of Regulation D of the Act, including no attempt to file a required "Form D," no filing for approval or registration

NOT ORIGINAL DOCUMENT
10/07/2020 09:32:18 AM
bmrenzenbrink

in the Commonwealth of Kentucky, no attempt to provide sufficient financial documentation to investors, nor any attempt to verify if Lighthouse was an accredited investor.

52. Without an appropriate exemption KRS Chapter 292, *et seq* (the "Kentucky Blue Sky Laws") apply.

53. In connection with the Offering, US Melon, Sung, and Kodish employed a scheme to defraud Lighthouse into investing in US Melon based on false, fraudulent, and untrue misrepresentations of fact.

54. In connection with the Offering, US Melon, Sung, and Kodish employed a scheme to defraud Lighthouse into investing in and extending credit to US Melon.

55. In connection with the Offering, US Melon, Sung, and Kodish affirmatively made a number of untrue statements of material facts, including but not limited to the specific misrepresentations made with regard to the existence of and potential liability for debts owed as of April 9, 2019 and April 16, 2019, in an effort to induce Lighthouse to invest in and extend credit for the benefit of US Melon.

56. The misrepresentations made by Sung and Kodish were material to a reasonable person's decision to invest in US Melon.

57. The misrepresentations of Sung and Kodish were made with an intent to mislead Lighthouse and induce Plaintiff to rely upon them.

58. Lighthouse did, in fact, rely upon these misrepresentations.

59. Any reasonable person would rely upon these misrepresentations.

60. As a result of its reasonable reliance, Lighthouse was damaged in an amount in excess of $25,000, the full extent of which is to be determined at trial, punitive damages, and statutory damages pursuant to the Kentucky Blue Sky laws. Further, Lighthouse is entitled to its

NOT ORIGINAL DOCUMENT
10/07/2020 09:32:18 AM
bmrenzenbrink

attorneys' fees and rescission of the Subscription Agreement, as well as Lighthouse and Myers' obligations arising from the Second Restated and Amended Operating Agreement.

**COUNT FOUR – VIOLATION OF SEC RULE 10B-5**

**(Against US Melon, Sung, and Kodish)**

61. Plaintiff incorporates by reference the previous paragraphs as if fully restated herein.

62. The Subscription Agreement and the Offering involved the sale of a security, being the LLC Unit interests in US Melon.

63. The Offering was not registered as required by the Act and no disclosures relevant to the risk factors or speculative nature of the Offering were provided to Lighthouse.

64. US Melon, Sung, and Kodish made affirmative misrepresentations in connection with the Offering including, but not limited to: (i) the concealment of hundreds of thousands of dollars in undocumented debts, (ii) the misrepresentations about the use of other Members' capital contributions, (iii) several misrepresentations contained in the Offering Documents (including the concealment of hundreds of thousands of dollars of debt from the balance sheet), and (iv) the misrepresentation that US Melon had no financial or operating history.

65. Additionally, there were many unfounded claims in the Offering Documents projecting returns that are materially and grossly inaccurate.

66. Those misrepresentations were made with the intent to manipulate and deceive Lighthouse into investing in and extending credit for the benefit of US Melon.

67. Those misrepresentations were material to any reasonable person's decision to participate in the Offering and invest in US Melon.

68. Those misrepresentations were, in fact, relied upon by Lighthouse in good faith.

NOT ORIGINAL DOCUMENT
10/07/2020 09:32:18 AM
bmrenzenbrink

69. Lighthouse's reliance on those misrepresentations has caused Lighthouse to lose the entirety of its investment (as well as the economic value of the money had they not been defrauded) believed to be in excess of $275,000.

70. If Lighthouse knew about the unreasonable debts and risky operating history of US Melon which Defendants were obligated to disclose to an investor like Plaintiff, it would have not participated in the Offering.

71. If any reasonable person knew about the unreasonable debts and risky operating history of US Melon, that person or entity would not participate in the Offering for US Melon's LLC Units.

72. Lighthouse is entitled to not only the full value of the securities and any and all associated economic loss attributable to the money converted, but also additional (per occurrence) statutory damages, punitive damages, attorneys fees, and a rescission of the Subscription Agreement and the Second Amended and Restated Operating Agreement.

**COUNT FIVE - BREACH OF FIDUCIARY DUTY BY SHEEHYUNG SUNG AND KEN KODISH**

73. Plaintiff incorporates by reference the previous paragraphs as if fully restated herein.

74. Sheehyung Sung, in his position as co-manager of US Melon, per the terms of the Second Amended Operating Agreement, was an agent, employee, and fiduciary of US Melon.

75. Ken Kodish, in his position as member of US Melon and through his solicitation and promotion of investment by Plaintiff, acted as an agent, employee, and fiduciary of US Melon.

76. As agents, employees, and fiduciaries of US Melon, Sung and Kodish owed fiduciary duties of care and loyalty to the Members of US Melon and to US Melon.

NOT ORIGINAL DOCUMENT
10/07/2020 09:32:18 AM
bmrenzenbrink

77. Sung and breached those fiduciary duties by directing US Melon and its members to stop issuing payments to creditors and farmers other than to one particular farm with whom Sung had a personal guarantee.

78. Sung's actions caused US Melon and, consequentially, Plaintiff to suffer monetary damages.

79. At the time of Sung's directive to stop issuing payments to creditors and farmers, it was foreseeable that US Melon and Plaintiff would suffer consequential damages through the commencement of lawsuits of produce suppliers and other creditors for non-payment, damaging the financial condition of the company and its Members.

80. Kodish breached those fiduciary duties to US Melon and its members by failing to disclose material obligations and losses of US Melon and by failing to exercise reasonable business judgment in the course and scope of his duties with US Melon.

81. As a direct and proximate result of Sung's and Kodish's breach of fiduciary duties to US Melon and its other members, Plaintiff has suffered significant financial damages and is entitled to both compensatory and consequential damages.

**WHEREFORE**, Plaintiff Lighthouse Transportation Services, LLC, respectfully requests this Court to grant relief as follows:

i. Judgment in favor of Plaintiff against the Defendants on all causes of action in its Complaint;

ii. Judgment in favor of Plaintiff against Defendants in excess of $25,000 plus interest from September 2020 through satisfaction of judgment;

iii. Reasonable attorney fees and court costs incurred by Plaintiff in the litigation of this action;

NOT ORIGINAL DOCUMENT
10/07/2020 09:32:18 AM
bmrenzenbrink

iv. Punitive damages in favor of Plaintiff against Defendants due to the malicious and willful acts and commissions of Defendants;

v. Rescission of the Subscription Agreement, the Second Amended and Restated Operating Agreement, and any related obligations; and

vi. Any other and further relief to which Plaintiff may be entitled at law or in equity.

Respectfully submitted,

**BUECHNER HAFFER MEYERS & KOENIG CO., L.P.A.**

Brett M. Renzenbrink (94049)
Buechner Haffer Meyers & Koenig Co., LPA
221 E. Fourth Street, Suite 2300
Cincinnati, Ohio 45202-4125
(513) 579-1500; Fax: (513) 977-4361
brenzenbrink@bhmklaw.com
*Attorney for Plaintiff Lighthouse Transportation Services, LLC*

1446497

NOT OFFICIAL DOCUMENT
10/07/2020 09:40:10 AM
bmrennenbring

EXHIBIT A

**SUBSCRIPTION AGREEMENT**

**THIS SUBSCRIPTION AGREEMENT** (the "**Agreement**"), effective as of April 16, 2019 (the "**Effective Date**"), is entered into by and between US MELON LLC, a Florida limited liability company, with offices at 2910 County Road, Suite 136, White Springs, FL 32096 (the "**Company**"), and the undersigned subscriber Lighthouse Transportation Services LLC (the "**Subscriber**").

**RECITALS**

**WHEREAS,** units of membership interest are referred heretofore as "**Units**," as defined in the First Amended and Restated Operating Agreement of the Company dated April 16, 2019 (the "**Operating Agreement**"); and

**WHEREAS,** Subscriber desires to purchase a certain number of Units of the Company pursuant to the provisions of this Agreement; and

**WHEREAS,** the Members of the Company unanimously have determined that it is in the best interest of the Company to provide Subscriber with an opportunity to acquire an ownership interest in the Company by the purchase of Units;

**NOW, THEREFORE,** in consideration of the foregoing and the mutual promises herein contained, the Parties signatory hereto agree as follows:

**ARTICLE I. SUBSCRIPTION OF UNITS**

The Subscriber hereby agrees to subscribe from the Company, and the Company hereby agrees to issue to the Subscriber, ten (10) Units (the "**Subscribed Units**"), in the amount of $125,000.00 (One Hundred Twenty-Five Thousand U.S. Dollars) (the "**Exercise Price**"), subject to the Company's Articles of Organization and Operating Agreement by and among the Company and its Members.

The Subscriber has also agreed that upon receiving the Subscribed Units, the Subscriber will provide and secure a line of credit from Subscriber's bank of choice on behalf of Company in the amount of:

- $300,000.00 (Three Hundred Thousand U.S. Dollars) for a line of credit for the general business of Company; and
- $500,000.00 (Five Hundred Thousand U.S. Dollars) for a line of credit for the transportation business.

In the event Subscriber is unable to secure this line of credit within seven (7) business days from the Effective Date of this Agreement, Subscriber understands and agrees that its Subscribed Units would be reduced to 5 Units instead of 10 for the Exercise Price.

**A.** **Issuance of Membership Interests.** Upon the Company's acceptance of the Exercised Price, Subscriber shall receive 10% (ten percent) of the membership interest in the Company, consisting of ten (10) Units.

Initials: ___ (SS); ___ (JM).

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

**B.** **Operating Agreement**. The Subscriber agrees to join and abide by the terms of the Company's operating agreement dated APRIL 16, 2019 and any amendment thereto.

## ARTICLE II. REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Units to be delivered to the Subscriber will, when issued in accordance with the terms hereof, be validly issued, fully paid, and non-assessable and will not be subject to any unpaid transfer or other taxes.

The Company has all right and authority to execute and deliver this Agreement. This Agreement is a valid and binding agreement of the Company enforceable against the Company in accordance with its terms, except as the enforceability hereof may be affected by bankruptcy, insolvency, or similar laws affecting creditors' rights generally, or by court-applied equitable remedies.

## ARTICLE III. ACKNOWLEDGEMENTS OF THE SUBSCRIBER

The Subscriber understands and acknowledges that:

(a) The Company has virtually no financial or operating history.

(b) There are substantial risks incident to the ownership of Units in the Company, and such investment is speculative and involves a high degree of risk of loss by the Subscriber of the Subscriber's entire investment in the Company.

(c) The Subscriber has been advised to consult the Subscriber's own attorney concerning the Company and to consult with independent tax counsel regarding the tax considerations of participating in the Company.

(d) The books and records of the Company will be reasonably available for inspection by the Subscriber and the Subscriber's representatives at the Company's place of business.

(e) The offering has not been registered under the Securities Act of 1933, as amended ("Act"), and the Units have not been qualified with the Securities and Exchange Commission. Under section 3(b) of the Act and Rule 506 promulgated by the Securities and Exchange Commission, certain limited offers and sales of securities are exempt from registration. In order to qualify for a limited offering exemption, Rule 506 requires, among other things, that Subscriber either alone or with his Subscriber representative has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment, or that the Company reasonably believes immediately prior to making any sale that the Subscriber comes within this description. The Company is relying on the Subscriber's representations contained in this Subscription Agreement in determining that such condition exists and that such requirement has been satisfied.

(f) The Units have not been qualified as securities with the Secretary of State of the State of Florida, and the issuance of such Units or the payment or receipt of any part of the consideration before such qualification is unlawful, unless the transfer of such Units, or any part of them, is exempt from qualification. In order to qualify for an exemption, Florida Business

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

Corporation Act requires, among other things, that Subscriber must (i) either have a preexisting personal or business relationship with the Company, or any of its Directors or controlling persons, or (ii) by reason of Subscriber's business or financial experience (or the business or financial experience of its professional advisors, who are unaffiliated with and who are not compensated by the Company or any affiliate or selling agent of the Company, directly or indirectly) may be reasonably assumed to have the capacity to protect the Subscriber's own Units in connection with the transaction contemplated by this Agreement. The Company is relying on the Subscriber's representations contained in this Subscription Agreement in determining that one or both such conditions exist and that such requirement has been satisfied.

(g) Neither the Securities and Exchange Commission, nor the Florida Secretary of State, nor any other federal or state agency has passed upon the Units or made any finding or determination concerning the fairness of this investment and no such agency has recommended or endorsed the Units.

(h) Since the Units have not been registered under the Act or registered or qualified under any state law, a Subscriber of Units must bear the economic risk of investment for an indefinite period of time because the Units will bear a restrictive legend (to the extent they are evidenced by certificates) and may not be sold, pledged, or otherwise transferred in the absence of an effective registration or qualification under federal and applicable state law or an opinion by counsel to the Company that such registration or qualification is not required.

(i) The Company is under no obligation and has not undertaken to register or qualify the sale, transfer, or other disposition of Units by it or on its behalf, to take any other action necessary in order to make compliance with an exemption from registration or qualification available, or to register or qualify the Units at any time in the future.

(j) The Subscriber will not make any sale, transfer, or other disposition of Units except in compliance with the Act and its Rules and Regulations and applicable Florida and other state law.

(k) The transferability of Units is further restricted by the Operating Agreement of the Company, which requires the majority approval of the Members. There can be no assurance that such approval will be forthcoming. No public market exists for the Units or is anticipated to exist for the Units.

**ARTICLE IV. <u>REPRESENTATIONS AND WARRANTIES OF THE SUBSCRIBER</u>**

Subscriber hereby represents that the Units are being acquired for investment and not with a view to, or for resale in connection with, any distribution of those Units. Subscriber intends to hold the Units for investment for Subscriber's own account and does not presently intend to dispose of all or any part of those Units. Subscriber hereby represents to the Company that Subscriber has sufficient knowledge and experience in financial and business matters to evaluate the potential risk of this investment and that Subscriber has been afforded access to all information concerning the Company that Subscriber has reasonably requested. Subscriber hereby represents that Subscriber is aware that the Company is in need of funding for short-term operational needs and that the receipt of revenues in the future is uncertain.

Subscriber understands that the Units are not registered under the Securities Act of 1933, as amended, by reason of a specific exemption under the provisions of the Act. Subscriber

Initials: SLS (SS); JM (JM).

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

consents that the Company, if it so desires, may permit the transfer of Units referred to in this Agreement without registration under the Securities Act of 1933 only on compliance with the conditions that (a) Subscriber gives prior written notice to counsel for the Company, setting forth Subscriber's intention to effectuate the transfer and describing briefly the manner of proposed transfer; and (b) Subscriber thereafter receives an opinion of counsel for the Company stating that the proposed transfer may be effected lawfully without registration of the Units under the Securities Act of 1933, as amended, as then in force.

Subscriber agrees that a legend to the foregoing effect shall be placed on the certificate or certificates delivered to Subscriber or any substitute therefor.

Subscriber further agrees that the Company may place a stop-transfer order with the Company's transfer agent, so as to prohibit the transfer of the Units until the above conditions and terms have been fulfilled.

## ARTICLE V. NOTICES

Any and all notices required or permitted under this Agreement shall be in writing and shall be personally delivered, sent by registered mail, a recognized overnight delivery service, or by other means which affords the sender evidence of delivery, or of rejected delivery, to the respective parties at the addresses shown below, unless and until a different address has been designated by written notice to the other Party. Any notice by a means which affords the sender evidence of delivery, or rejected delivery, shall be deemed to have been given at the date and time of receipt or rejected delivery.

| | |
|---|---|
| To Subscriber: | LIGHTHOUSE TRANSPORTATION SERVICES LLC<br>Attn: Joe Myers<br>100 W 6th Street<br>Covington, KY 41011<br>E-mail: |
| To Company: | US MELON LLC<br>Attn: Sheehyung Sung<br>9005 147th Road<br>Live Oak, Florida 32060<br>E-Mail: erik.sung@usmelon.com |
| With a copy to: | EPGD ATTORNEYS AT LAW, P.A.<br>777 SW 37th Avenue, Suite 510<br>Miami, Florida 33135<br>Fax: (305) 718-0687<br>E-Mail: eric@EPGDLaw.com |

## ARTICLE VI. CONSTRUCTION AND EFFECT; PARTIES BOUND

This Agreement shall be binding on Subscriber and the Company, and each of their respective heirs, legal representatives, successors, and assigns. Each party to this Agreement consulted with legal counsel regarding its rights and obligations under this Agreement, and has

Initials SH (SS); JM (JM).

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

thoroughly reviewed the Agreement. Accordingly, this Agreement shall not be interpreted or construed more strictly against the party causing this Agreement to be drafted. No modification, termination, or attempted waiver shall be valid unless in writing and signed by the party against whom the same is sought to be enforced. This Agreement shall constitute the entire agreement between the Parties hereto, and shall supersede all prior agreements, understandings, and arrangements, both oral and written, between the Parties hereto, with respect to the subject matter hereof. This Agreement shall be governed by, and be construed and enforced in accordance with, the laws of the State of Florida, USA, without regard to the conflict of laws principles thereof. The state and federal courts in and for Miami-Dade County, Florida, USA, shall have exclusive jurisdiction and venue with respect to any disputes arising hereunder, and the Parties hereby waive any objection to such jurisdiction and venue. In legal proceedings instituted to enforce this Agreement, the party who prevails in such proceedings shall be entitled to the award of its reasonable attorney's fees and litigation costs, plus fees and costs incurred by it in executing and/or collecting any judgment, at all trial and appellate levels.

**IN WITNESS WHEREOF**, the Parties have made this Agreement effective as of the date first above written.

**US MELON LLC:**

**Sheehyung Sung**, Manager

**SUBSCRIBER:**

**Lighthouse Transportation Services LLC**
By: Joe Myers
Title: Manager

**WITNESSES:**

M. Craig McDaniel
**Name:**

M. Craig McDaniel
**Name:**

NOT ORIGINAL DOCUMENT

EXHIBIT B

# US MELON LLC

BALANCE SHEET

As of April 9, 2019

| | TOTAL |
|---|---|
| ASSETS | [redacted] |
| Current Assets | |
| Bank Accounts | |
| Cash on hand | |
| TD BUSINESS CONVENIENCE PLUS (5065) | |
| **Total Bank Accounts** | |
| Accounts Receivable | |
| Accounts Receivable (A/R) | |
| **Total Accounts Receivable** | |
| Other Current Assets | |
| Allowance for Bad Debts | |
| Inventory Asset | |
| Undeposited Funds | |
| **Total Other Current Assets** | |
| **Total Current Assets** | |
| Fixed Assets | |
| Equinox | |
| **Total Fixed Assets** | |
| **TOTAL ASSETS** | |
| LIABILITIES AND EQUITY | |
| Liabilities | |
| Current Liabilities | |
| Credit Cards | [redacted] |
| Chase Ink Business Unlimited | |
| **Total Credit Cards** | |
| **Total Current Liabilities** | |
| Long-Term Liabilities | |
| Notes Payable - Equinox | |
| **Total Long-Term Liabilities** | |
| **Total Liabilities** | |
| Equity | |
| Opening Balance Equity | |
| Owner's Investment | |
| Retained Earnings | |
| Net Income | |
| **Total Equity** | |
| **TOTAL LIABILITIES AND EQUITY** | |

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

**US Melon**

**Summary**

Currently, farmers/workers are struggling to fairly participate in agriculture economics. Farmers/workers absorbs the biggest risks but share the smallest portion of the profits. Our project goal is to create a distribution structure with farmers/workers at the center, both in terms of value and profit. US MELON will serves as a value added broker for farmers/workers.

US Melon will be structured as an efficient corporation but will operate in cooperative mode, maximizing the inherent benefits of capitalistic corporation with durability of farming co-operation.

US MELON is a sustainable shareholder operated company that will offer high quality produce to a range of customers (large to small), by farmers/workers for farmers/workers. Shareholder structure will have all 4 key component of farming value chain (Growers, Contract Labors, Transportation, Brokers)

**Our Ethos**

The Company will have the following immutable beliefs that will govern above all.

- Treat all people with respect (Don't be evil)
- Respect and support farmers
- Transparency amongst cooperative members
- Growth through quality and cooperation

**The Plan**

The current produce economy is highly fragmented and has many middle man, as produce travels from the farm to the customer. It is US MELON's goal to remove multi-layer of cost centers to deliver highest quality farm product to quality conscious customers and offer highest return to the growers.

The Company will be represented in the complete service loops (growers, transportation, harvesting crew, employees). Starting with watermelon but will horizontal integrate into various different vegetables.

Both large and smaller customers require a consistent and reliable product throughout the year. Yet most farmers are only able to grow for small window of time. It is US MELON's plan to connects various farmers geographically to address this. Moreover, US MELON will select strategic growers, based on character and quality, for year-round supply.

Traditionally farmers are forced to adopt an adversarial model of operation with other farmers. This is due to brokers pinning farmers against each other to maximize their profits to ensure commodity type of pricing for produce. US MELON believes that farming is inherently cooperative, and farmers naturally help each other. By creating a network of growers who financially patriciate in US MELON, farming economics would transform from adversarial to cooperative operation. Initially, it will require attracting similar thinking farmers who can lay the foundation and tone of this concept, Cooperation amongst significant growers (100 Ac Minim).

Contract labor is a key component in farming value chain. It is hugely important that they patriciate in the ownership and operation of A2S2. They will provide social conscious to the company as well as lose the loop of communication between the customer and company.

**Customers**

Initially US MELON will focus on:

- High end retails stores
- Quality driven distributors

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

- High end processors

They represent the right combination of volume and margin to launch US MELON. Eventually, we will expend into smaller and specialty markets.

Our ideal customers can benefit from US MELON's value, both financial and social, proposition:

- Support American farmers
- Maximize support local products
- High and reliable quality product
  - Consistent yearly supply
  - Food safety and quality compliance
- Support fair cooperative farming
- Support socially responsible farming

**Grower/Workers**

US MELON is a collective of Growers and workers. It is to support the growers that we created US MELON. The real value to growers are:

- Be assured lowest possible brokerage fees
- Seed selection and acquisition support
- Collective purchasing power to reduce input cost
- Farm support
  - In-house crop consultant
  - Labor support
  - Food safety compliance support
  - Q&A assurance
- Price stability
- Market visibility
- Working capital assistance through 3rd party arrangement
- Sustainable contract labor support
- Located strategically for specialty packing

In order launch this project, we are looking for top growers with highest ethics. It is imperative to the company that we work with man of integrity and value. There are 3 Classification of Growers:

1. Major Grower (Repack, Pack, Grow)
2. Minor Grower (Grow)
3. Fill-in Growers (Grow and ship)

They must have high Values:

- Integrity
- Significant experience required
- The Company will have the sole right to select the grower

**Labor Support**

In our current environment, labor is perhaps the biggest unaddressed issue. Therefore, US MELON will have contract labor properly represented as both participation and ownership. It is important that US MELON operate with strong social value to respectfully work with all levels of employees and contractors.

**Transportation**

Safe and quality transportation is a key aspect of farming value chain. Therefore, it is essential that transportation is properly represented in US MELON in both participation and ownership. Their involvement will guarantee smooth delivery to the customer as well as painless and equitable support to the growers.

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

**Financial**

Based on 6-month sales estimate with conservative 10% fee structure, it is anticipated that Peak Funding needs is approximately $365,806, with cumulative cash totaling approximately $3,068,608 at the end of 2019. This represents 819% return.

**Shareholder Structure**

US MELON is a grower-centric operation, created by farmers for the farmers and the workers and their customer. It is imperative that Growers and Workers maintain control and profit from US MELON.

In general (after full year of operation – full investor contribution made):

| | |
|---|---|
| Growers | 61% |
| Workers | 29% |
| Investors | 10% |

There are 2 categories under each above group. Equity contributed and sweat equity contributed. This will be further clarified in the Memorandum of Understanding.

Investor opportunity is 10% for $400,000. This represents 84% return within 1 year.
This is a very attractive investment opportunity. Therefore, it is essential that we select a value-added investor, who will also provide the following:

- Set up rolling LC for $3M to partially finance production
- Assist in large contract with strategic customers
- Develop long term exist strategy

**Initial Holdings**

The project founders will reserve 20% of the stock (non-dilutable) shares. In addition to Investor (cash capital)s, the remaining equity will be broken into 8 blocks of equal shares. Each 8 blocks will be held as the following:

| | |
|---|---|
| Growers: | 5 |
| Transportation: | 1 |
| Contract Labor: | 1 |
| Employee: | 1 |

In order to participate, each individual will pay for their share in accordance with evaluation of the company at the launch. For those unable to fully pay their share, US MELON will provide an option to purchase their full share within 1 year but at initial offering price plus premium.

We anticipate that each block of shares will cost approximately $50k, with premium purchase being roughly double the amount.

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

Grower Highlights:

- This is a significant long term opportunity. US MELON exit strategy is either a buyout or public offering. A typical IPO can range 50-xxx multiple of revenue. Even at first year, with profit of $3.6M, choosing the most conservative multiplier, this translate to $180M. $50k investment share would be approximately worth $17M. Market is perfect for large farming investments. Grower model is not investable, but investable integrated farming operation is in extreme shortage. This is the ideal exit strategy for growers.
- Brokering is the most profitable of farming value chain. Farmers must integrate this to their business model.
- The purpose of US MELON is create a successful company with growers as priority
- Growers shareholders will regulate brokerage %
- US MELON intends to pay any excess profit back to the growers and employees
- $50,000 investment returns $271,000 per year (in profit, but US MELON will pay bonus and reserve cash before dividends)
    - If the market is high and the company efficient, growers will receive additional bonus back. The structure of bonus to be determined by the growers
    - Transparency in transaction (no more -shady deals)
- Cooperation amongst farmers to lower cost of operation

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

**Premium Grower Summary**

Brokering Fee Paid: 9-10%

Transportation Premium: 5%

Investment: $10,000
Est. Return: $ 71,000 (min)

% of Company owned: 7.5%

- Growers will determine how much profit will be released
- Growers will determine above brokering fee %
- Only 5 grower spots available (2 taken)
- Bonus paid based on quality and volume

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

## Model Assumptions

### REVENUE

| | |
|---|---|
| Yield/Ac (Big) | 60000 |
| Yield/Ac (MINI) | 60000 |
| $/lb | 0.16 |
| Brokerage Fee | 10% |

### EQUIPMENT

| Item | Number | $/Unit | |
|---|---|---|---|
| Desktop Computer | 3 | $ 1,200 | $ 3,600 |
| Laptop | 4 | $ 900 | $ 3,600 |
| Desks | 7 | $ 700 | $ 4,900 |
| Chairs | 7 | $ 150 | $ 1,050 |
| Misc | 1 | $ 1,000 | $ 1,000 |
| Total: | 22 | | **$ 14,150** |

### OPEX GENERAL

| Item | Number | $/Unit | |
|---|---|---|---|
| Rent | 12 | $ 2,000 | $ 24,000 |
| Professional Services | 1 | $ 10,000 | $ 10,000 |
| licenses/membership fees | 1 | $ 4,000 | $ 4,000 |
| Travel expenses/ retail /PM | 1 | $ 15,000 | $ 15,000 |
| Electricity | 12 | $ 250 | $ 3,000 |
| Maintenance | 12 | $ 300 | $ 3,600 |
| Gas | 12 | $ 400 | $ 4,800 |
| Total: | 51 | | **$ 64,400** |

### SALARY

| Poisition | Number | $/Annum | % T&Fica | |
|---|---|---|---|---|
| President | 1 | $ 75,000 | 8% | $ 81,000 |
| Senior Sales | 1 | $ 120,000 | 8% | $ 129,600 |
| Sales | 1 | $ 85,000 | 8% | $ 91,800 |
| Office Manager | 1 | $ 40,000 | 8% | $ 43,200 |
| Logistics | 1 | $ 50,000 | 8% | $ 54,000 |
| Q&A/Food Safety | 1 | $ 40,000 | 8% | $ 43,200 |
| Support | 1 | $ 30,000 | 8% | $ 32,400 |
| Total: | 7 | $ 440,000 | | **$ 475,200** |

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

**Production Details**

**MINI WATERMELON**

| Date | Location | Acreage | Product lbs | Product Loads | Details |
|---|---|---|---|---|---|
| January | | | - | - | |
| February | | | - | - | |
| March | [redacted] | | | | |
| April | | | | | |
| May | | | | | |
| June | | | | | |
| July | | | | | |
| August | | | | | |
| September | | | | | |
| October | | | | | |
| November | | | - | - | |
| December | | | - | - | |
| **Total:** | | [redacted] | | | |

**BIG WATERMELON**

| Date | Location | Acreage | Product lbs | Product Loads | Details |
|---|---|---|---|---|---|
| January | | 0 | - | - | |
| February | | 0 | - | - | |
| March | [redacted] | | | | |
| April | | | | | |
| May | | | | | |
| June | | | | | |
| July | | | | | |
| August | | | | | |
| September | | | | | |
| October | | 0 | - | - | |
| November | | 0 | - | - | |
| December | | 0 | - | - | |
| **Total:** | | [redacted] | | | |

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

| Phase I FINANCIALS (US$) | September | October | November | December | January | February | March | April | May | June | July | August | September | October | November | December |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | M1 | M2 | M3 | M4 | M5 | M6 | M7 | M8 | M9 | M10 | M11 | M12 | M13 | M14 | M15 | M16 |

[redacted]

| | | |
|---|---|---|
| External Contingency | 25% | |
| Total Investment Required: | $ | (370,306.25) |
| Bonus Payout | 20% | $ 606,521.67 |

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

## Modification Log

| Date | Who | What |
| --- | --- | --- |
| 7/12/18 | Erik Sung | Created assumption sheet and basic strcture |
| 19-Jul | Ken Kodsih | Proffessiobnl services -raised to accommodate legal - assume- there wil be contaacts written between shareholders, grower commitmemntns / brokerage company commitments etc |
| 19-Jul | Ken Kodsih | Added profffesinal membership services, itrade, blue book, PACA itrade, foodlink etc |
| 19-Jul | Ken Kodsih | raised Sr sales and sales base salary - less "could be negotiated" but beter to assume a little more. |
| 19-Jul | Ken Kodsih | Added travel expenses to accommodate PMA, SEPC, grower tripsand retail trips. |
| 19-Jul | Erik Sung | Incorporated KK changes (travel et al) into the model |

NOT ORIGINAL DOCUMENT
10/07/2020 0[illegible] AM
bmrenzenbrink

EXHIBIT
C

# SECOND AMENDED AND RESTATED OPERATING AGREEMENT

for

**US MELON LLC**

**Prepared by:**

EPGD
BUSINESS LAW

TEL (786) 837-6787 | FAX (305) 718-0687 – www.EPGDLaw.com – Eric@EPGDLaw.com
777 SW 37TH AVENUE, SUITE 510, MIAMI, FLORIDA 33135

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

**SECOND AMENDED AND RESTATED
OPERATING AGREEMENT FOR
US MELON LLC**

THIS SECOND AMENDED AND RESTATED OPERATING AGREEMENT ("Agreement") of **US MELON LLC** ("LLC") is hereby approved and made effective this 16 day of July, 2020 ("Effective Date"), by and between the undersigned Members (collectively the "Members"). Any and all prior operating agreements adopted by the LLC are hereby revoked.

**RECITALS**

The Members desire to create a comprehensive document reflecting their intentions regarding the operation of the LLC, concerning the participation of current and future Members in the LLC, as well as all other matters relating to the LLC through this Agreement, which fully replaces any existing operating agreement(s) of the LLC.

In consideration of the covenants and the promises herein, the Members hereby agree as follows:

**ARTICLE I
DEFINITIONS**

**1.1 Generally**. Pursuant to Regulation §301.7701–3, the LLC shall be treated as a partnership for Federal income tax purposes, and the tax treatment of the LLC shall be governed by Subchapter K of the Code. Certain definitions contained in this Agreement refer to sections of the Code or Regulations involving partnerships. However, the intention is to utilize the concepts and requirements of the Code and Regulations involving partnerships, and the definitions contained herein should be read consistently with each provision of the Code and Regulations.

**1.2 Certain Definitions**. As used in this Agreement, the following terms shall have the meanings specified as follows:

**(a)** "Act" means the Florida Revised Limited Liability Company Act, as amended from time to time.

**(b)** "Adjusted Capital Account Deficit" shall mean, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

**(i)** Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to this Agreement or is deemed to be obligated to restore to the LLC pursuant to the penultimate sentences of Regulations §§1.704–2(g)(1) and 1.704-2(i)(5); and

**(ii)** Debit to such Capital Account the items described in Regulations §§1.704–1(b)(2)(ii)(d)(4), (5), and (6).

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

Except as otherwise provided herein, the foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulation §1.704–1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

**(c)** "Affiliate" means, with respect to any Person, (a) any Person directly or indirectly owning, controlling or holding with power to vote ten percent (10%) or more of the outstanding voting securities of that Person; (b) any Person ten percent (10%) or more of whose outstanding voting securities are directly or indirectly owned, controlled or held with power to vote by that Person; (c) any Person directly or indirectly controlling, controlled by or under common control with that Person; and (d) any officer, director, partner or manager of any Person described in subsection (a), (b) or (c) of this paragraph, and the term "control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management, activities or policies of any Person whether through the ownership of voting securities, by contract, employment or otherwise.

**(d)** "Approval of the Members," "Approved by the Members," or "Consent of the Members" (whether capitalized or lower case) shall have the meaning set forth in Section 6.8.

**(e)** "Business" shall have the meaning set forth in Section 2.5.

**(f)** "Capital Account" means the amount of a Member's Capital Contribution, as adjusted, including but not limited to increases due to profits or additional contributions and decreases due to losses and distributions.

**(g)** "Capital Contribution" means any contribution of value, including but not limited to, cash, property, assets, etc., by a Member to the capital of the LLC.

**(h)** "Code" means the Internal Revenue Code of 1986, as amended.

**(i)** "Depreciation" means, for any given Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset of the LLC for such year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Managers.

**(j)** "Fair Value" shall have the meaning set forth in Section 605.1061(5) of the Act.

**(k)** "Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

**(i)** The initial Gross Asset Value of any asset contributed by a Member to the LLC shall be the gross fair market value of such asset, as determined by the Managers;

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

**(ii)** The Gross Asset Values of all LLC assets shall be adjusted to equal their respective gross fair market values (taking Code Section 7701(g) into account), as determined by the Managers as of the following times: (1) the acquisition of additional Units in the LLC by any person in exchange for more than a *de minimis* capital contribution or upon the exercise of an option; (2) the distribution by the LLC to a Member of more than a *de minimis* amount of LLC property as consideration for Units; (3) the grant of an interest in the LLC (other than a *de minimus* interest) as consideration for the provision of services to or for the benefit of the LLC; and (4) the liquidation of the LLC within the meaning of Regulations Section 1.704–1(b)(2)(ii)(g);

**(iii)** The Gross Asset Value of any item of LLC assets distributed to any Member shall be adjusted to equal the gross fair market value (taking Code Section 7701(g) into account) of such asset on the date of distribution as determined by the Managers; and

**(iv)** The Gross Asset Values of LLC assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704–1(b)(2)(iv)(m) and subparagraph (vi) of the definition of "Profits" and "Losses" or Section 4.4; provided, however, that Gross Asset Values shall not be adjusted pursuant to this subparagraph (iv) to the extent that an adjustment pursuant to subparagraph (ii) is required in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraph (ii) or (iv), such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset, for purposes of computing Profits and Losses.

**(l)** "Initial Members" are the Members identified in Exhibit A prior to any future amendments.

**(m)** "LLC Assets" shall mean the assets and property, whether tangible or intangible and whether real, personal, or mixed, at any time owned by or held, directly or indirectly, for the benefit of the LLC and all right, title and interest, if any, held and owned by, directly or indirectly, the LLC in other persons or entities.

**(n)** "LLC Minimum Gain" shall have the meaning set forth in Regulation §1.704–2(d), adjusted appropriately to take into account liabilities of each Subsidiary, if any, and the relevant assets of each such Subsidiary.

**(o)** "Manager(s)" shall have the meaning set forth in Section 7.1.

**(p)** "Member" means any person or entity who owns an Interest in this LLC, signs this Agreement, and is admitted as a Member of the LLC.

**(q)** "Member Minimum Gain" shall mean an amount, with respect to each Member Nonrecourse Debt, equal to the LLC Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Regulation §1.704–2(i)(3).

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

**(r)** "Member Nonrecourse Debt" shall mean a liability as defined in Regulation §1.704–2(b)(4), adjusted appropriately to take into account liabilities of each Subsidiary.

**(s)** "Member Nonrecourse Deductions" shall mean the member nonrecourse deductions as defined in Regulation §1.704–2(i)(2), with respect to the LLC and for each Subsidiary. The amount of Member Nonrecourse Deductions with respect to a Member Nonrecourse Debt for a Fiscal Year equals the net increase, if any, in the amount of Member Minimum Gain during such Fiscal Year attributable to such Member Nonrecourse Debt, reduced by any distributions during that Fiscal Year to the Member that bears the economic risk of loss for such Member Nonrecourse Debt to the extent that such distributions are from the proceeds of such Member Nonrecourse Debt and are allocable to an increase in Member Minimum Gain attributable to such Member Nonrecourse Debt, determined according to the provisions of Regulations §§1.704–2(h) and 1.704–2(i).

**(t)** "Membership Interest" or "Interest" means an ownership interest in the LLC, which includes the right to vote, the right to participate in management, the right to obtain information concerning the LLC and any other rights granted to a Member under the Act, the Articles of Organization, and/or this Agreement.

**(u)** "Membership Units" or "Units" means the numerical equivalent of Percentage Interest as reflected in absolute numerical value held by any Member.

**(v)** "Nonrecourse Deductions" shall mean the nonrecourse deductions as defined in Regulation §1.704–2(b)(1), with respect to the LLC and each Subsidiary. The amount of Nonrecourse Deductions for a Fiscal Year equals the net increase, if any, in the amount of LLC Minimum Gain during such Fiscal Year reduced by any distributions during such Fiscal Year of proceeds of a Nonrecourse Liability that are allocable to an increase in LLC Minimum Gain, determined according to the provisions of Regulations §§1.704–2(c) and 1.704–2(h).

**(w)** "Nonrecourse Liability" shall mean a liability defined in Regulation §1.704-2(b)(3), taking into account liabilities of the LLC and each Subsidiary.

**(x)** "Notice of Acceptance" shall have the meaning set forth in Section 8.2(b).

**(y)** "Notice of Proposed Transfer" shall have the meaning set forth in Section 8.2(a).

**(z)** "Notice to Members" shall have the meaning set forth in Section 8.2(c).

**(aa)** "Offered Terms" shall have the meaning set forth in Section 8.2(a).

**(bb)** "Offered Units" shall have the meaning set forth in Section 8.2(a).

**(cc)** "Offeror" shall have the meaning set forth in Section 8.2(a).

**(dd)** "Percentage Interest" shall mean, with respect to each Member, the percentage set forth next to each Member's name in **Exhibit A**, attached hereto and incorporated

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

herein, and representing the Member's Percentage Interest in the LLC, as such Percentage Interest may be changed, from time to time, in accordance with the terms of this Agreement.

**(ee)** "Person" means natural persons, corporations, limited partnerships, general partnerships, limited liability companies, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and governments and agencies and political subdivisions thereof.

**(ff)** "Profits" and "Losses" shall mean, respectively, for each Fiscal Year or other period, an amount equal to the LLC's taxable income or loss for such Fiscal Year or period, determined in accordance with Code §703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code §703(a)(1) shall be included in taxable income or loss) with the following adjustments:

**(i)** Any income of the LLC that is exempt from federal income tax or excluded from federal gross income and not otherwise taken into account in computing Profits or Losses pursuant to this Section shall be added to such taxable income or loss;

**(ii)** Any expenditures of the LLC described in Code §705(a)(2)(B) or treated as Code §705(a)(2)(B) expenditures pursuant to Regulations §1.704–1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this Section, shall be subtracted from such taxable income or loss;

**(iii)** In the event the Gross Asset Value of any LLC Asset is adjusted pursuant to any provision of this Agreement in accordance with the definition of Gross Asset Value, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such LLC Asset for purposes of computing Profits or Losses;

**(iv)** Gain or loss resulting from any disposition of any LLC Asset with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such LLC Asset differs from its Gross Asset Value;

**(v)** In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period, computed in accordance with the definition of Depreciation;

**(vi)** To the extent an adjustment to the adjusted tax basis of any LLC asset pursuant to Code Section 734(b) is required, pursuant to Regulations Section 1.704–(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Interest in the LLC, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) from the disposition of such asset and shall be taken into account for purposes of computing Profits or Losses; and

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

**(vii)** Notwithstanding any other provision of this Section, any items which are allocated pursuant to Section 5.2 shall not be taken into account in computing Profits or Losses.

**(gg)** "Regulations" shall mean the temporary and permanent Treasury Regulations promulgated under the Code as such Regulations may be amended from time to time (including corresponding provisions of succeeding Regulations).

**(hh)** "Subsidiary" means any entity in which the LLC holds a direct or indirect ownership interest.

**(ii)** "Third-Party Proposed Transferee(s)" shall have the meaning set forth in Section 8.2(a).

**(jj)** "Unanimous Vote of the Members," "Unanimous Approval of the Members," or "Unanimous Consent of the Members" shall have the meaning set forth in Section 6.8.

## ARTICLE II
## FORMATION

**2.1 State.** The Members have formed the LLC pursuant to the laws of the State of Florida by filing the Articles of Organization with the Secretary of State of the State of Florida.

**2.2 Name.** The name of the LLC is US MELON, LLC. The Members shall operate the business of the LLC under such name or use such other names as the Members deem necessary, provided that such names do not violate the Act.

**2.3 Principal Office.** The LLC's principal place of business will be located at 2910 County Road, Suite 136, White Springs, Florida 32096, or any other location mutually agreed upon by the Members. If the principal office is located outside the state of organization, and the LLC has one or more business offices in the state of organization, the Members shall fix and designate a principal business office in the state of organization. Branch or subordinate offices may be established at any time and at any place as the Members may determine.

**2.4 Term.** The LLC will continue to exist until terminated or dissolved in accordance with its Articles of Organization or this Agreement.

**2.5 Business Purpose.** The "Business" of the LLC is to engage in any lawful act or activity for which limited liability companies may be formed under the Act. The LLC shall have the authority to do all lawful things incidental, necessary or convenient to accomplish and operate its Business as described in this Section.

**2.6 Registered Agent and Registered Office.** The LLC's registered agent will be Sheehyung Sung, 9005 147th Road, Live Oak, Florida 32060 or any other person or entity with an office in the state of organization as determined by the Members.

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

## ARTICLE III
## MEMBERSHIP

**3.1 Initial Members**. The Initial Members of the LLC are those persons set forth in **Exhibit A** attached hereto, along with their respective addresses and Membership Interest held in the LLC.

**3.2 Additional Members**. Additional Members of the LLC may be admitted from time to time upon such terms and conditions as determined by a Majority Consent of the Members and in accordance with the provisions of this Agreement. All new Members must sign a joinder to this Agreement, agreeing to be bound by the terms of this Agreement and as may be amended in the future.

**3.3 Liability to Third Parties**. No Member shall be liable for the debts, obligations or liabilities of the LLC to a third party unless the Member agrees in writing to be liable.

**3.4 Authority**. No Member has the authority or power to act for or on behalf of, to bind, or to incur any liability on behalf of the LLC except as provided in this Agreement.

**3.5 Compensation**. No Member, Affiliate, or Person shall receive compensation for services rendered to the LLC except as expressly permitted by this Agreement or any other written agreement, or as permitted by a Majority Consent of the Members. However, the LLC shall reimburse Members for any expense paid by them that is properly an expense of the LLC.

**3.6 Issuance of LLC Certificates.** If the LLC issues membership certificates, each Member's Percentage Interest shall be represented by a LLC Certificate in such form as is determined by the Managers.

**3.7 Transfer of LLC Certificates.** Any Membership Interest which is transferred in accordance with the terms of this Agreement shall be transferable on the books of the LLC. However, the transfer of a Membership Interest shall not be entered until the previously issued LLC Certificate representing such Membership Interest is surrendered to the LLC and canceled and a replacement LLC Certificate is issued to the assignee of such Membership Interest.

**3.8 Lost, Stolen, or Destroyed Certificates.** The LLC shall issue a new LLC Certificate in place of any LLC Certificate previously issued if the holder of the LLC Certificate satisfactorily proves that a previously issued LLC Certificate has been lost, destroyed, or stolen. If a Member fails to notify the LLC within a reasonable time after it has notice of the loss, destruction, or theft of a LLC Certificate, and a transfer of the Membership Interest represented by the LLC Certificate is registered before receiving such notification, the LLC shall have no liability with respect to any claim against the LLC for such transfer or for a new LLC Certificate.

**3.9 Voluntary Withdrawal.** Any Initial Member holding a minority interest of the Units in the LLC may, at any time, tender that Member's Units to the LLC in exchange for the Fair Value of the Units tendered by initiating the Buy-Sell procedure in Section 8.6 below.

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

## ARTICLE IV
## CAPITAL ACCOUNTS

**4.1 Initial Contributions**. The Initial Members shall be deemed to have contributed as of the Effective Date of this Agreement, whether in the form of cash or non-cash past contributions, the Capital Contributions listed in **Exhibit B** in exchange for their respective Membership Interest set forth in **Exhibit A**, both said exhibits being attached hereto and incorporated herein by reference.

**4.2 Additional Contributions**. No Member shall have any obligation to make any additional Capital Contributions to the LLC. Additional Capital Contributions shall arise only with the Majority Consent of the Members in their determination that the LLC requires capital in addition to the Initial Contributions.

**4.3 Capital Accounts.** A Capital Account shall be established and maintained for each Member. Each Capital Account will be accounted for separately and will be maintained in accordance with generally accepted accounting principles. If a Member validly transfers his, her or its Percentage Interest, the Capital Account of the transferring Member shall carryover to the transferee Member in accordance with the Code.

**4.4 Adjustments to Capital Accounts**. Each Member's Capital Account shall be adjusted as follows:

**(a) Increases**. Each Member's Capital Account shall be increased by:

**(i)** Capital Contributions of cash and/or property at its agreed upon fair market value; and

**(ii)** All items of LLC income and gain (including income and gain exempt from tax).

**(b) Decreases.** Each 'Capital Account shall be decreased by:

**(i)** Distributions of cash and/or property at its agreed upon fair market value; and

**(ii)** All items of LLC deduction and loss (including deductions and loss exempt from tax).

**4.5 Advances by Members**. Members may, at any time, advance moneys to the LLC. Any advance shall be a loan from the Member to the LLC and shall bear interest at a commercially reasonable interest rate as determined by the Members. An advance is not a Capital Contribution.

**4.6 Return of Capital**. No Member shall have the right to withdraw or obtain a return of his or her Capital Contribution except as provided in this Agreement. The return of a Member's Capital Contribution may not be withdrawn in the form of property other than cash except as provided in this Agreement.

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

## ARTICLE V
## ALLOCATION OF PROFITS AND LOSSES AND DISTRIBUTIONS

**5.1 Allocation of Profits and Losses.**

**(a)** After giving effect to the mandatory allocations set forth in Section 5.2 Profits and Losses for any Fiscal Year and subject to Sections 5.1(b) and 5.1(c) below, such Profits and Losses shall be allocated among the Members in proportion to their respective Percentage Interests.

**(b)** All Losses that would otherwise be allocated to any Member pursuant to Section 5.1(a) which exceed his, her or its respective Capital Account balance shall be allocated to the other Members in proportion to their respective Interest percentages.

**(c)** If Losses have been allocated under this Section 5.1, then thereafter Profits shall be allocated in the following priority:

**(i)** First, to the Members until the aggregate allocation of Profits to each Member pursuant to this Section 5.1(c) for all Fiscal Years or portions thereof are equal to the aggregate allocations of Losses to each Member pursuant to Section 5.1(a) for all Fiscal Years or portions thereof, in reverse order, and, in proportion to the prior allocations of Losses to the Members pursuant to Section 5.1(b).

**(ii)** Second, to all Members, in proportion to their respective Percentage Interests, the remainder of such Profits.

**5.2 Mandatory Allocations.** The following special allocations shall be made in the following order:

**(a) Minimum Gain Chargeback.** Notwithstanding any other provision of this Article V, if there is a net decrease in LLC Minimum Gain during any Fiscal Year or other applicable period, then, subject to the exceptions set forth in Regulations §1.704–2(f)(2), (3), (4) and (5), each Member shall be specially allocated items of LLC income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in LLC Minimum Gain, as determined in accordance with Regulation §1.704–2(g). Allocations pursuant to the previous sentence shall be determined in accordance with Regulation §1.704–2(f). This Section 5.2(a) is intended to comply with the minimum gain chargeback requirement in such section of the Regulations and shall be interpreted consistently therewith.

**(b) Member Minimum Gain Chargeback.** Notwithstanding any other provision of this Article V except Section 5.3, if there is a net decrease in Member Minimum Gain attributable to a Member Nonrecourse Debt during any Fiscal Year or other applicable period, then, subject to the exceptions set forth in Regulation §704–2(i)(4), each Member who has a share of the Member Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulation §1.704–2(i)(5) shall be specially allocated items of LLC income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Member Minimum Gain attributable to such Member

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

Nonrecourse Debt, determined in accordance with Regulation §1.704–2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Regulation §1.704–2(i)(4). This Section 5.2(b) is intended to comply with the minimum gain chargeback requirement in such section of the Regulations and shall be interpreted consistently therewith.

**5.3 Qualified Income Offset**. Notwithstanding any provision of this Article V except Section 5.2(a), in the event any Member receives any adjustments, allocations, or distributions described in Regulations §§1.704–1(b)(2)(ii)(d)(4), (5) or (6), that cause or increase an Adjusted Capital Account Deficit of such Member, items of LLC income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible. This Section 5.3 is intended to comply with the qualified income offset provision of Regulation §1.704–1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

**5.4 No Excess Deficit**. To the extent that any Member has or would have, as a result of an allocation of Loss (or item thereof), an Adjusted Capital Account Deficit, such amount of Loss (or item thereof) shall be allocated to the Members in accordance with their relative Percentage Interests to the extent that such allocations do not produce an Adjusted Capital Account Deficit as to such Members.

**5.5 Nonrecourse Deductions**. Nonrecourse Deductions for any Fiscal Year or other applicable period shall be allocated to the Members pro rata in accordance with their Percentage Interests as of the end of such Fiscal Year or other applicable period.

**5.6 Member Nonrecourse Deductions.** Any Member Nonrecourse Deductions for any Fiscal Year or other applicable period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Regulation §1.704–2(i)(1).

**5.7 Code § 754 Adjustments.** To the extent an adjustment to the adjusted tax basis of any LLC Asset pursuant to Code § 734(b) or Code § 743(b) is required, pursuant to Regulations § 1.704–1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such section of the Regulations.

**5.8 Curative Allocations.** Any mandatory allocations of items of income, gain, loss or deduction pursuant to Sections 5.2(a) and 5.2(b) shall be taken into account for the purpose of equitably adjusting subsequent allocations of income, gain, loss or deduction so that the net allocations, in the aggregate, allocated to each Member pursuant to this Article V, and the Capital Accounts of each Member, shall as quickly as possible and to the extent possible, be the same as if no mandatory allocations had been made.

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

**5.9 Other Allocation Rules.**

**(a)** For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Members using any permissible method under Code § 706 and the Regulations thereunder.

**(b)** The Members are aware of the income tax consequences of the allocations made by this Article V and hereby agree to be bound by the provisions thereof in reporting their shares of LLC income and loss for income tax purposes.

**5.10 Tax Allocations.**

**(a)** Except as otherwise provided for in this Section 5.10, for Federal income tax purposes, each item of income, gain, loss and deduction shall be allocated among the Members in the same manner as its correlative item of "book" income, gain, loss or deduction is allocated pursuant to Sections 5.1 – 5.9 above.

**(b)** In accordance with Code §704(c) and the Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the LLC shall, solely for federal income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the LLC for federal income tax purposes and its initial Gross Asset Value.

**(c)** In the event the Gross Asset Value of any LLC Asset is adjusted as described in subparagraph (ii) of the definition of Gross Asset Value, subsequent allocations of income, gain, loss and deduction with respect to such LLC Asset shall take into account any variation between the adjusted basis of such LLC Asset for Federal income tax purposes and its Gross Asset Value in the same manner as under Code §704(c) and the Regulations thereunder.

**(d)** Any elections or other decisions relating to such allocations shall be made by the Partnership Representative in a manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this Section 5.10 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provision of this Agreement.

**5.11 Books, Records, Accounting and Reports**. The LLC shall maintain, or cause to be maintained, in a manner customary and consistent with good accounting principles, practices and procedures, a comprehensive system of office records, books and accounts (which records, books and accounts shall be and remain the property of the LLC) in which shall be entered fully and accurately each and every financial transaction with respect to the ownership and operation of the property of the LLC. Such books and records of account shall be prepared and maintained at the principal place of business of the LLC or such other place or places as may from time to time be determined by the Members. Each Member or its duly authorized representative shall have the right to inspect, examine and copy such books and records of account at the LLC's office during reasonable business hours and to receive other material information about the LLC and its operations. A reasonable charge for copying books and records may be charged by the LLC.

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

**5.12 Determination of Available Net Cash Flow for Distribution.**

**(a)** In reasonably determining the amount of Net Cash Flow to distribute, the Managers may consider such factors as the need to allocate funds to any reserves for LLC contingencies, the desirability of prepaying the debt borrowed under any financing agreement entered into by the LLC, or any other LLC purposes that the Managers reasonably deem appropriate or necessary.

**(b)** For purposes of this Section, Net Cash Flow shall be deemed to include applicable tax credits or tax deducted or withheld to the extent that, in the reasonable opinion of the Managers, such credits or deduction or withholding would give rise to a credit to a Member if such Member were an individual U.S. resident or citizen. To the extent that the amount of any tax credits or tax deducted or withheld depends on the identity, composition or characteristics of a Member, the relevant amount of such tax shall be allocated to such Member and shall be treated as a distribution of Net Cash Flow to such Member.

**(c)** Other than a reasonable amount withheld for operating expenses, the Managers shall distribute Net Cash Flow to the Members. Distributions shall be made to the Members in proportion to the Member's Percentage Interests.

## ARTICLE VI
## RIGHTS AND DUTIES OF MEMBERS

**6.1 Place of Meeting.** Meetings of Members shall be held at any place within the United States designated by the Members and stated in the notice of the meeting. If no place is so specified, Members' meetings shall be held at the LLC's principal office.

**6.2 Annual Meeting.** An annual meeting of Members shall be held on the 1st day of January of each year at the LLC's principal office, or, at any other place and time mutually agreed by a majority of the voting interests of the Members; however, should such day fall upon a legal holiday, then the annual meeting of Members shall be held at the same time and place on the next day thereafter which is a full business day. At the annual meeting, any proper business may be transacted.

**6.3 Special Meetings.** A special meeting of the Members may be called at any time by one or more Members holding Interests which, in the aggregate, constitute not less than ten (10) percent of the Membership Interests. A request for a special meeting of the Members shall be in writing, specifying the time and place of the meeting and the general nature of the business proposed to be transacted. The notice shall be delivered in accordance with Sections 6.4 and 6.5 below.

**6.4 Notice of Members' Meetings.** All notices of meetings of Members shall be sent or otherwise given in accordance with Section 6.5 below and not less than ten nor more than sixty (60) days before the date of the meeting being noticed. The notice shall specify the place, date, and hour of the meeting and (i) in the case of a special meeting, the general nature of the business to be transacted, or (ii) in the case of the annual meeting, those matters which are intended to be presented for action by the Members. If a proposal contains (i) a contract or transaction in which a Member has a direct or indirect financial interest; (ii) an amendment of the Articles of

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

Organization; (iii) a reorganization of the LLC; or (iv) a voluntary dissolution of the LLC, the notice shall state the general nature of such proposal.

**6.5 Manner of Giving Notice; Affidavit of Notice**. Notice of any meeting of Members shall be given either personally, by first class mail, facsimile, telegraphic, electronic method, or other written communication, charges prepaid, addressed to each Member at the address of each Member appearing on the books of the LLC or more recently given by the Member to the LLC for the purpose of notice. Notice shall be deemed to have been given at the time when delivered personally, deposited in the mail, or sent by facsimile, telegram, or other means of written communication. If any notice addressed to a Member at the address of such Member appearing on the books of the LLC is returned to the LLC by the United States Postal Service marked to indicate that the United States Postal Service is unable to deliver the notice to the Member at such address, all future notices or reports shall be deemed to have been duly given without further mailing if the same shall be available to the Member upon written demand of the Member at the principal office of the LLC for a period of one-year from the date of the giving of such notice. An affidavit of the mailing or other means of giving any notice of any Members' meeting shall be executed by the Member giving such notice, and shall be filed and maintained in the books and records of the LLC.

**6.6 Conduct of Meetings**. All meetings of the Members shall be presided over by the President of the LLC, if any. The President of the LLC shall determine the order of business and the procedures to be followed at the meeting.

**6.7 Quorum**. The presence, in person or by proxy, of all the Members shall constitute a quorum at all meetings of the Members for the transaction of business.

**6.8 Voting**. Each Member shall have a number of votes equal to the Membership Units held by such Member. However, if a Member is not entitled to vote on a specific matter, then such Member's number of votes and Membership Interest shall not be considered for purposes of determining whether a quorum is present, or whether approval by vote of the Members has been obtained, with respect to such specific matter. An aggregate of fifty-one (51) percent or more of the authorized and allocated Membership Units shall be required to approve any action, unless a greater or lesser vote is specifically and unambiguously required pursuant to this Agreement or the Act. For avoidance of doubt and notwithstanding anything to the contrary in this Agreement, any reference in this Agreement to a required "Vote of the Members," "Approval of the Members," "Consent of the Members" or similar words (capitalized or not) relating to decisions to be made by the Members shall mean approval by not less than an aggregate of fifty-one (51) percent or more of the authorized and allocated Membership Units eligible to vote, decide or approve decisions or actions of the LLC at the time of the decision, unless specifically requiring a greater or lesser percentage in the context of said reference. Notwithstanding anything to the contrary, any reference in this Agreement to a required "Unanimous Vote of the Members," "Unanimous Approval of the Members," "Unanimous Consent of the Members" or similar words (capitalized or not) relating to decisions to be made by the Members shall mean approval of one hundred (100) percent of the authorized and allocated Membership Units eligible to vote, decide, or approve decisions or actions of the LLC at the time of the decision.

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

**6.9 Adjourned Meeting and Notice Thereof.** Any Members' meeting, annual or special, whether or not a quorum is present, may be adjourned from time to time by the vote of the majority of the Membership Interests represented at such meeting, either in person or by proxy, but in the absence of a quorum, no other business may be transacted at such meeting. When any meeting of Members, either annual or special, is adjourned to another time and place, notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken, unless a new record date for the adjourned meeting is fixed, or unless the adjournment is for more than five (5) days from the date set for the original meeting, in which case the Members shall set a new record date. Notice of any such adjourned meeting, if required, shall be given to each Member entitled to vote at the adjourned meeting in accordance with Sections 6.4 and 6.5 above. At any adjourned meeting, the LLC may transact any business which might have been transacted at the original meeting.

**6.10 Waiver of Notice or Consent by Absent Members.** The transactions of any meeting of Members, either annual or special, however called and noticed, and whenever held, shall be as valid as if it had occurred at a meeting duly held after regular call and notice, if a quorum be present either in person or by proxy, and if, either before or after the meeting, each person entitled to vote but not present in person or by proxy, signs a written waiver of notice, a consent to the holding of the meeting, or any approval of the minutes thereof. The waiver of notice or consent shall state either the business to be transacted or the purpose of any annual or special meeting of Members. All such waivers, consents and approvals shall be filed with the LLC's books and records. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, unless such person objects at the beginning of the meeting.

**6.11 Member Action by Written Consent without a Meeting.** Any action which may be taken at any annual or special meeting of Members may be taken without a meeting and without prior notice, if consent in writing, setting forth the action so taken, are signed by Members holding Membership Interests representing the aggregate number of votes equal to or greater than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Membership Interests entitled to vote thereon were present and voted. All such consents shall be filed with the LLC's books and records.

**6.12 Major Decisions.** Notwithstanding any other provision of this Agreement, the following actions or types of transactions shall require Majority Consent of the Members:

**(a)** Executing and delivering any general assignment for the benefit of creditors of the Members, or filing or consenting to the filing of a petition under any federal or state bankruptcy, insolvency, or reorganization law;

**(b)** The amendment or modification of this Agreement;

**(c)** The disposition of all or substantially all of the LLC's assets;

**(d)** The issuance of additional Units or Membership Interests;

**(e)** The admission of additional Members;

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

**(f)** Making any material change to the nature of the business conducted by the LLC;

**(g)** Making any decision outside the ordinary course of business;

**(h)** Entering into any agreement for the acquisition or the sale of the LLC;

**(i)** The formation of a Subsidiary or entering into any joint venture;

**(j)** The making or requiring of any additional Capital Contributions; and

**(k)** Permitting any Member to engage in any business or transaction substantially related to the Business of the LLC.

## ARTICLE VII
## MANAGEMENT OF THE LLC

**7.1 Management by Managers**. The LLC shall be managed by two (2) Managers. Until further action of the Members as provided herein, Sheehyung Sung and Joe Myers are hereby elected and appointed as Managers of the LLC. The Managers each have the full and exclusive right, power, and authority to manage the affairs of the LLC, to make all decisions with respect to the LLC that are not otherwise reserved to the Members under this Agreement, and execute in the name and on behalf of the LLC any and all agreements, contracts, documents, certifications and instruments necessary or convenient in connection with the management, maintenance and operation of the LLC, or in connection with managing the affairs of the LLC. The Managers shall not take any action with regard to any of the matters or actions specifically requiring the Approval of the Members or Unanimous Vote of the Members in this Agreement.

## ARTICLE VIII
## TRANSFER OF MEMBERSHIP INTERESTS; BUY-SELL

**8.1 Transfer or Assignment of Percentage Interests**. Except as otherwise provided in Section 8.2, Section 8.7 and Section 8.8 below, no Member may transfer, in whole or in part, his, her, or its Percentage Interest at any time without the Majority Consent of the Members. Any transfers in violation of this ARTICLE VIII are void at inception.

**8.2 Right of First Refusal**. Transfer of any Percentage Interest of the LLC shall only be permitted as follows:

**(a)** Any Member or any authorized person acting on behalf of a Member (the "Offeror"), desiring to transfer any Units shall cause such offer to be reduced to writing and shall, within ten (10) days of the date the offer was made, deliver said offer to the LLC (the "Notice of Proposed Transfer") containing the following information: (a) the number of Units proposed to be so transferred and whether they are Membership Units of Financial Units (the "Offered Units"); (b) the date the offer was made; and (c) the terms and conditions of the proposed transfer, including (i) the identity of any person(s) desiring to purchase/acquire the Offered Units if the LLC and other holders of rights of first, second, or third refusal fail to exercise their pre-emptive rights ("Third-Party Proposed Transferee(s)"); and (ii) the per Unit price to be charged for each of the Offered

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

Units proposed to be transferred and the consideration to be received therefor (the "Offered Terms").

**(b)** The date that the Notice of Proposed Transfer is received by the LLC shall constitute the Notice Date. Under all circumstances, the LLC shall have the primary and exclusive first option to acquire all or any portion of the Offered Units in accordance with the provisions of the Notice of Proposed Transfer for a period of thirty (30) days from the Notice Date. The LLC may exercise such option by giving written notice that it is exercising its option to acquire any or all of the Offered Units on the same terms and conditions as reflected in the Offered Terms (the "Notice of Acceptance"). The Notice of Acceptance shall refer to the Notice of Proposed Transfer and shall set forth the number of Units to be acquired by the LLC.

**(c)** In the event that the LLC fails to timely exercise its rights of first refusal as to all of the Offered Units, then all Members have the second right to purchase any or all of the Offered Units remaining, under the same conditions as the LLC, and offered so that all participating Members shall have the ability to acquire the Offered Units in such proportion so as to maintain the same relative ownership of the class or category of the Offered Units. The Members will be notified of their rights by the Offeror within fifteen (15) days of the expiration of the deadline for the LLC to exercise its rights of first refusal (the "Notice to Members") and shall have ten (10) days after the expiration of the LLC's right to purchase.

**(d)** After following the steps set forth in Sections 8.2(a) above, if there are any Offered Units left, then they shall be made available to any third party in strict conformity with the Offered Terms and subject to the reasonable Majority Consent of the Members.

**(e)** The consummation of any transfer required pursuant to an exercise of option rights created by this ARTICLE VIII shall constitute the "Closing," and the time and date of such Closing shall constitute the "Closing Date." The Closing shall be held at the principal office of the LLC at a date and time set by the LLC within thirty (30) days after any acceptance of Offered Terms. Such Offered Units shall be transferred free of all liens and encumbrances or adverse claims of any kind or character. Upon the execution of documents reasonably required by the Managers (including a joinder to this Agreement in a form reasonably approved by the Managers, whereby the transferee agrees to be bound by the terms of this Agreement), and in exchange for the full payment of the offered price in conformity with the Offered Terms as set forth in the applicable Notice of Acceptance as set forth above, the transferee shall become a Member and holder of the Offered Units.

**(f)** Notwithstanding anything to the contrary in this ARTICLE VIII, transfers of Units into an entity fully owned and controlled by the transferring, and transfer upon death of a Member, shall be permitted, subject to the Majority Vote of the Members.

**(g)** All notices referenced in this ARTICLE VIII shall be deemed delivered when placed with a recognized national carrier for overnight delivery (i.e., Federal Express, UPS, DHL, or USPS). It is the responsibility of the party sending notice to confirm that the notice is delivered at the most recent address of the addressee on file with the LLC. It is the responsibility of the LLC to promptly provide updated addresses upon request.

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

**8.3 Tag Along Rights.** Notwithstanding anything to the contrary in this Agreement, provided that if Members holding at least a majority of the allocated Membership Units desire to sell or otherwise transfer all or substantially all of their Membership Units ("Selling Majority Members"), then the other Members may elect to participate in the contemplated sale to the third party purchaser by the Selling Members by delivering written notice to the Selling Majority Members within ten (10) days after receipt of Notice of the contemplated transaction ("Tag Along Rights"). If the other Members elect, individually or in the aggregate, to participate in the sale, the Selling Members and the electing other Members shall be entitled to sell in the contemplated sale, at the same price and on the same terms, their *pro rata* portion of the total Percentage Interest to be sold in the contemplated sale. In connection with any sale under this Section, each electing other Member shall agree to make with respect to itself only, and not jointly with any other party, substantially the same representations, warranties, covenants and indemnities and other similar agreements as the Selling Members agree to make in connection with the proposed sale. The net purchase price attributable to such sale shall be allocated amongst all of the Members *pro rata* in accordance with their respective Percentage Interests and without any adjustments for controlling interests or otherwise.

**8.4 Drag-Along Right**. If, after offering to the LLC and other Members the right of first refusal to purchase the pertinent Membership Interests pursuant to Sections 8.2 (Right of First Refusal) or Section 8.7 (Death or Incapacity) hereof, as the case may be, the Majority Member(s) desire and are able to transfer to a bona-fide third party purchaser (pursuant to a good-faith offer) an amount of Membership Interests representing at least fifty percent (50%) of the issued and outstanding Membership Interests of the LLC, the Majority Member(s) shall have the right to require the other Members (**"Drag-Along Members"**) to participate in the proposed transaction by delivering a written notice (the **"Drag-Along Notice"**) to every Drag-Along Member (i) offering to include in the proposed transaction a portion of such Drag-Along Member's Membership Interests determined by multiplying (x) the number of Units held by such Drag-Along Member by (y) the quotient determined by dividing (A) the number of Units proposed to be transferred by the Majority Member(s) by (B) the number of Units held by the Majority Member(s), and (ii) indicating (x) the amount of consideration to be paid for the Membership Interests, and (y) the closing date, which shall be not more than sixty (60) days after the date of receipt of the Drag-Along Notice from the Majority Member(s). The Majority Member(s) and the Drag-Along Member(s) will cooperate with each other in connection with the consummation of the proposed transaction. At the closing, the Drag-Along Member(s) shall deliver (i) the certificates representing the pertinent Membership Interests duly endorsed in blank, or accompanied by a duly executed transfer power, free and clear of any and all liens, claims, and encumbrances, and (ii) any and all other documents that may be reasonable required by the transferee.

**8.5 Transfer to Affiliate**. Any Member may, notwithstanding the foregoing, freely transfer Membership Interests to an Affiliate, but only on the condition that the Affiliate executes a counterpart of this Operating Agreement and agrees to be bound by all the restrictions on the Members hereunder. For the purposes of this Operating Agreement an **"Affiliate"** shall mean with respect to any Member any other person or entity that directly or indirectly controls, is controlled by, or is under common control with such Member, including without limitation any trust as part of the subject Member's testamentary disposition or bona-fide estate planning. For the purposes

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

of this paragraph, the term "**control**" (and its derivatives) means ownership of more than fifty percent (50%) of the equity.

**8.6 Voluntary Buy-Sell.** Any Initial Member holding less than a fifty (50) percent Percentage Interest in the LLC shall be entitled to exercise the buy-sell rights set forth in this Agreement by delivering a Buy-Sell Notice (as defined herein).

**(a)** If a Member wishes to exercise the buy-sell right provided in this Section, such Member ("Selling Member") shall deliver to the other Member ("Buying Member") written notice of such election, which notice shall include a description of the circumstances that triggered the buy-sell right ("Buy-Sell Notice"). Within ten (10) days of the Selling Member providing the Buying Member the Buy-Sell Notice, the Selling Member and the Buying Member shall mutually select an independent, qualified appraiser with no less than ten (10) years' experience to appraise the Selling Member's Membership Interest. The value of the Units set by appraisal shall be the Fair Value of the Units ("Sell-out Price").

**(b)** The closing of any purchase and sale of Membership Interests pursuant to this Section 8.6 shall take place within sixty (60) days after the Buy-Sell Notice is delivered. The Sell-out Price shall be paid as a lump sum at closing by wire transfer of immediately available funds to an account designated in writing by the Selling Member. At the closing, the Selling Member shall deliver to the Buying Member good and marketable title to its Membership Interest, free and clear of all liens and encumbrances. Each Member agrees to cooperate and take all actions and execute all documents reasonably necessary or appropriate to reflect the purchase of the Selling Member's Membership Interest by the Buying Member.

**(c)** Notwithstanding anything in this Agreement to the contrary, if the Buying Member defaults in any of its material closing obligations pursuant to this Section 8.6, then the Selling Member shall have the option to trigger the termination and dissolution of the LLC, as outlined in Article XII of this Agreement. In such event, the Members agree that the Selling Member shall hereby have the power of attorney to be the liquidating member and shall have the exclusive right and obligation to wind up the LLC business, including full power and authority to sell and transfer LLC assets, engage professional services, sign and submit tax matters, execute and record a statement of dissolution, pay and settle debts, and distribute LLC assets to the respective Members. Proceeds from the disposition of LLC assets pursuant to this Section 8.4 shall be applied first to the satisfaction of all LLC debts and liabilities. Proceeds and assets remaining after payment of creditors shall be distributed as follows: (a) to the Selling Member to the extent of the positive balance of his, her, or its Capital Account; (b) to the Selling Member in proportion to his, her, or its Percentage Interests, (c) to the remaining Members to the extent of the positive balances of their respective Capital Accounts, and (d) any remaining amounts shall be distributed to the remaining Members in proportion to their Percentage Interest.

**(d)** If the Members are unable to reach a resolution of any matter pursuant to this Section 8.6, any Member may file a petition with a court of competent jurisdiction asking the court to appoint a person unknown to the Members or their counsel as referee to resolve any such pending dispute(s). The cost of said proceedings shall be borne by the LLC, but the referee may, in the referee's sole discretion, allocate the legal fees, costs, and expenses between the LLC and one or more Members in such proportion as the referee shall decide. Any Member may seek the

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

court's adoption of the referee's decisions as an order of the court, if it is necessary to give effect to same. In consultations, the Members may also agree to mutually agree to a referee without utilizing the formal court proceedings. However, the decisions of said informally appointed referee shall be deemed final and binding on the Members with the same force and effect of duly convened arbitration under Florida law and may be enforced by any court of competent jurisdiction. It is the purpose of this provision that the Members work to resolve any dispute, and select a person they mutually accept to resolve any unresolvable dispute, prior to seeking a court's intervention to resolve such disputes.

**8.7 Involuntary Buy-Sell**. Upon the death of a Member ("Decedent Member"), his or her estate shall transfer, and the LLC shall receive, the Membership Interest owned by the Decedent Member at the time of his or her death. In exchange, the Decedent Member's estate shall receive, at the time of the transfer, a payout amount equal to the higher of: (1) the amount of life insurance coverage collected or collectible by the LLC under any policy or policies of life insurance insuring the life of the Decedent Member; or (2) the Fair Value of the Decedent Member's Membership Interest at the time of his or her death, as appraised by a mutually-selected, independent appraiser with no less than ten (10) years' experience ("Payout Price"). For purposes of clarity, in no event shall the Payout Price be less than any life insurance coverage amount insuring the Decedent Member at the time of his or her death, regardless of whether the LLC is successful in collecting such life insurance coverage. In the event that the Fair Value of the Decedent Member's Membership Interest is greater than the life insurance coverage for such Decedent Member, the LLC shall pay the Decedent Member's estate any such difference at the time of the transfer. The Managers shall meet annually to ensure and determine that the amount of insurance coverage for each Member is equal to the value of such Member's Membership Interest in the LLC and increase the insurance coverage policies if commercially reasonable and available.

**8.8 Involuntary Withdrawal.** Unless otherwise agreed by majority of the remaining Members, any Member's membership in the LLC shall terminate in the event such Member or, if such Member is a business entity, the ultimate individual beneficial owner of such entity (each case being an event of "**Involuntary Withdrawal**" from the LLC): (a) by means of intentional misconduct, fraud, or dishonesty usurped a corporate opportunity of the LLC; (b) is convicted of a felonious crime involving fraud, embezzlement, financial impropriety, or misappropriation involving the LLC and/or the LLC's assets; (c) becomes a person or entity with whom the members, manager, or the LLC is restricted from doing business with under regulations of the Office of Foreign Asset Control ("**OFAC**") of the Department of the Treasury (including, but not limited to, those named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order (including, but not limited to, the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action or engages in any dealings or transaction or be otherwise associated with such persons or entities; or (d) pursuant to the Florida Limited Liability Company Act, as amended from time to time, or as otherwise provided by applicable law, shall be deemed to have withdrawn from the LLC. During any pending legal proceeding or governmental investigation involving or that may result in any of the foregoing causes of Involuntary Withdrawal, the subject Member's voting rights in the LLC (as well as any rights to represent or act on behalf of the LLC) may be suspended, and economic interests in the LLC may be placed in escrow, by majority vote of the remaining Members, or placed into such account, custody or other possession as required by law.

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

(a) **Consequences of Involuntary Withdrawal**. Upon a Member's involuntary withdrawal from the LLC, the LLC may be continued by majority vote of the remaining Members.

(b) **Option to Continue Company**. If the Members elect to continue the LLC after an Involuntary Withdrawal, the withdrawn Member shall be deemed to offer for sale (the **"Withdrawal Offer"**) to the LLC all of the Membership Interests owned of record and beneficially by the withdrawn Member (the **"Withdrawal Interest"**).

(i) The Withdrawal Offer shall be and remain irrevocable for a period (the **"Withdrawal Offer Period"**) ending at 11:59 P.M., local time at the LLC's principal office on the sixtieth (60th) day following the date the Members elect to continue the LLC or such day on which the LLC accepts the Withdrawal Offer. At any time during the Withdrawal Offer Period, the LLC may accept the Withdrawal Offer by notifying the withdrawn Member (the **"Withdrawal Notice"**) of its acceptance. The withdrawn Member shall not be deemed a Member or Manager for the purpose of the vote on whether the LLC shall accept the Withdrawal Offer.

(ii) If the LLC accepts the Withdrawal Offer, the Withdrawal Notice shall fix a closing date (the **"Withdrawal Closing Date"**) for the purchase, which shall not be later than ninety (90) days after the expiration of the Withdrawal Period.

(iii) If the LLC accepts the Withdrawal Offer, the LLC shall purchase the Withdrawal Interest for a price equal to the amount the distribution the withdrawn Member would receive if the LLC's assets were liquidated at Book Value and all debts were paid (the **"Withdrawal Purchase Price"**). The Withdrawal Purchase Price shall be paid in one lump sum on the Withdrawal Closing Date unless the LLC elects, prior to or on the Withdrawal Closing Date, to pay the Withdrawal Purchase Price within a period of no more than twenty-four (24) months after the Withdrawal Closing Date.

(iv) If the LLC fails to accept the Withdrawal Offer, or if the LLC does not wish to purchase all of the Withdrawal Interests, the remaining Members may elect to accept the Withdrawal Offer to the extent not accepted by the LLC. If more than one remaining Member elects to purchase the Withdrawal Interest, each Member shall be entitled to purchase that portion of the Withdrawal Interest that equals a fraction, the denominator of which shall be the total Units owned by all Members electing to purchase the Withdrawal Interest, and the numerator of which shall be the total Units owned by the pertinent remaining Member. If the entire Withdrawal Interest is not purchased by the LLC and/or the remaining Members, as the case may be, upon the expiration of the Withdrawal Offer Period, the withdrawn Member shall be treated as the unadmitted assignee of a Member unless the withdrawn Member is admitted again as a new Member by the Board pursuant to Section 3.2.

(c) **Valuation of Withdrawal Interest**

(i) The term **"Book Value"** means the book value, computed in accordance with the LLC's customary accounting practices, of the withdrawn Member's equity of the LLC as of the end of the last full taxable year immediately preceding the year in which occurs

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

the event giving rise to the sale of the Withdraw Interest. Notwithstanding anything contained in this Operating Agreement to the contrary, the computation of Book Value shall be subject to the following provisions:

1) Book Value shall not include any proceeds collected or collectible by the LLC under any policy or policies of life or disability insurance insuring the life or disability of a Member, as a result of the death or disability of a Member.

2) No additional allowance of any kind shall be made for the goodwill, trade names, or any other intangible asset or assets (the "**Intangible Assets**") of the LLC other than the aggregate dollar amount for any of those Intangible Assets appearing on the most recent balance sheet of the LLC prior to the date on which Book Value is to be determined.

3) Reserves for contingent liabilities shall not be treated as a liability for purposes of determining Book Value.

4) No adjustment shall be made to Book Value as a result of any event occurring subsequent to the date as of which Book Value is to be determined.

**8.9** Book Value shall be determined by the accountants regularly employed by the LLC. The determination of the accountants shall, for the purposes of this provision, be binding and conclusive upon all parties.

## ARTICLE IX
## BOOKS AND RECORDS

**9.1 Annual Accounting**. Within ninety (90) days after the close of each fiscal year of the LLC, the LLC shall cause to be prepared and submitted to each Member a balance sheet and income statement for the preceding Fiscal Year of the LLC (or portion thereof) in conformity with generally accepted accounting principles and provide to the Members all information necessary for them to complete federal and state tax returns.

**9.2 Accounting Method**. For financial reporting purposes, the books and records of the LLC shall be kept on the cash or accrual method of accounting as applied in a consistent manner and shall reflect all transactions of the LLC and be appropriate and adequate for the purposes of the LLC as determined by the Managers.

## ARTICLE X
## TAXATION

**10.1 Fiscal Year**. The LLC's Fiscal Year shall end on December 31st.

**10.2 Tax Returns.** The accounts of the LLC may be reviewed, compiled or audited by accountants designated by the applicable Managers if and at such times that such Managers may deem it necessary or desirable. The applicable Manager(s) shall cause to be prepared all tax returns required of the LLC and in connection with the federal income tax returns, shall make elections under the Code in its/their discretion on behalf of the LLC (subject to Section 10.5 below).

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

**10.3 Partnership Representative.** Sheehyung Sung shall be the "Partnership Representative" of the LLC for the purposes of the Code for so long as he remains a Member. The "Partnership Representative" (i) shall, immediately upon receiving any notice from the IRS, send copies of the same to all Members; (ii) shall, in the event of an audit of the LLC's tax returns, keep each current Member and any person who was a Member during the tax year(s) under IRS review (each hereinafter a "Former Member") reasonably well-informed of developments pertaining to such audit; (iii) shall be authorized to take all actions reasonably necessary on behalf of the LLC with respect to any audits of its tax returns, including incurring reasonable costs and expenses relating to defense of such audits and any related litigation; and (iv) shall not bind the LLC or other Members with respect to taxes (including interest and penalties), or enter into a settlement agreement with the IRS on behalf of the LLC or the other Members, without the unanimous consent of the then-current Members.

**10.4 Indemnification of Partnership Representative.** The Members agree to indemnify, defend and hold harmless the Partnership Representative from and against all claims, costs, and expenses arising as a result of (i) any action taken by the Partnership Representative for which the Partnership Representative has received the unanimous consent of the Members; (ii) any action taken by the Partnership Representative that is required pursuant to the Code; and (iii) actions taken by the Partnership Representative reasonably related to the performance of his or her duties under this Tax Matters Addendum. (This provision shall survive the withdrawal, retirement, death, or other cessation of any Member from the LLC for a period of eight (8) years).

**10.5 Indemnification of Partnership.** Each Member shall indemnify, defend and hold harmless the LLC and each other Member for such Member's pro rata share of all tax liabilities (including interest and penalties) assessed against the LLC for each and every year during which such Member was a member of the LLC. (This provision shall survive the withdrawal, retirement, death, or other cessation of any Member from the LLC for a period of eight (8) years.)

**10.6 Certain Elections Concerning Audits.** The Members acknowledge that, absent an affirmative and timely election by the LLC pursuant to the Code, an unfavorable audit concerning one tax year may result in an assessment of tax liability (and related interest and penalties) against the LLC in a different tax year, at a time when the LLC may have different Members or the tax attributes of the LLC and its Members are different than in the audit year. Accordingly, in the event of an audit of any tax year, the Members hereby affirmatively and unanimously elect (and instruct the Partnership Representative to convey such election to the IRS) to have any assessment of increased tax, interest or penalties against the LLC as a result of such audit made against those persons who were Members of the LLC in the audited tax year(s) in lieu of an assessment against the LLC.

## ARTICLE XI
## INDEMNIFICATION

**11.1 Definitions: Agents, Proceedings, and Expenses.** For the purposes of this Agreement, "Agent" means any person who is or was a Member, Manager, Officer, employee, or other agent of this LLC; "Proceeding" means any threatened, pending or completed action or proceeding, whether civil, criminal, administrative, or investigative; and "Expenses" means any and all costs, fees, and expenses including but not limited to court costs and attorneys' fees.

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

**11.2 Actions other than by the LLC**. The LLC shall indemnify and hold harmless any person or Agent who was or is a party, or is threatened to be made a party, to any Proceeding (other than an action by or in the right of this LLC) by reason of the fact that such person is or was an Agent of this LLC, against expenses, judgments, fines, settlements and other amounts actually and reasonably incurred in connection with such Proceeding, if that person acted in good faith and in a manner that person reasonably believed to be in the best interests of this LLC, and, in the case of a criminal proceeding, had no reasonable cause to believe his or her conduct was unlawful. The termination of any Proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the person did not act in good faith and in a manner which the person reasonable believed to be in the best interests of this LLC or that the person had reasonable cause to believe that his or her conduct was unlawful. For purposes of clarity, this section shall apply only to claims or proceedings brought by non-Agents of the LLC.

**11.3 Other Contractual Rights**. Nothing contained in this ARTICLE XI shall affect any right to indemnification to which Agents of this LLC or any LLC Subsidiary may be entitled by contract, by Majority Vote of the Members, as a matter of law or equity, or otherwise.

**11.4 Subsequent Amendments to the Act or Florida Law**. In the event that the Act or other applicable law regarding indemnification of members, directors, officers, employees, and other agents of a LLC, as in effect at the time of adoption of this Agreement, is subsequently amended to in any way that increases the scope of permissible indemnification beyond that set forth herein, the indemnification authorized by this ARTICLE XI shall be deemed to be coextensive with the maximum afforded by the state of organization's law as so amended.

**11.5 Insurance**. The LLC may, upon a determination by the Managers, purchase and maintain insurance on behalf of any Agents of the LLC against any liability which might be asserted against or incurred by the Agents in such capacity, or which might arise out of the Agents' status as such, whether or not the LLC would have the power to indemnify such Agents against that liability.

## ARTICLE XII
## TERMINATION AND DISSOLUTION

**12.1 Dissolution**. The LLC shall be dissolved and its business wound up upon the Majority Consent of the Members.

**12.2 Procedure**.

**(a)** In the event of the dissolution of the LLC, there shall be an orderly liquidation of the LLC Assets, unless the Members by majority determine that an immediate sale of all or part of the LLC Assets would cause undue loss to the Members, in which event:

**(i)** the liquidation may be deferred for a reasonable time except as to those assets necessary to satisfy the LLC debts and the Members shall be deemed to have elected to reconstitute the LLC for such period; or

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

**(ii)** all or part of the LLC Assets may be distributed in kind, to the Members in proportion to the Member's Percentage Interest.

**(b)** Upon any dissolution of the LLC, the Members shall prepare a statement setting forth the assets and liabilities of the LLC as of the date of dissolution and such statement shall be furnished to all Members.

**(c)** In the event of liquidation of the LLC Assets, the LLC Assets shall be liquidated as promptly as possible, and the Members shall supervise such liquidation, which shall be conducted in an orderly and business-like manner so as not to involve undue sacrifice, as determined by Majority Vote of the Members in their reasonable discretion.

**(d)** The proceeds thereof shall be applied and distributed in the following order of priority:

**(i)** for the payment of the debts and liabilities of the LLC (including any debts and liabilities owed to the Members and their affiliates) and the expenses of liquidation;

**(ii)** to the setting up of any reserves for any contingent or unforeseen liabilities or obligations of the LLC arising out of or in connection with the LLC, as deemed necessary by a Majority Vote of the Members. Said reserves may be paid over by the Members to an unaffiliated third-party attorney-at-law, as escrowee, to be held by such attorney for the purpose of disbursing such reserves in payment of any of the aforementioned contingencies and, at the expiration of such period as the Members shall deem advisable, to distribute the balance of such reserves to the Members in accordance with this Section;

**(iii)** thereafter, to the Members in proportion to their Percentage Interest.

**(e)** No dissolution of the LLC shall release or relieve the Members of their obligations under this Agreement.

**12.3 Provisions Cumulative.** All provisions of this Agreement relating to the dissolution, liquidation and termination of the LLC shall be cumulative to the extent not inconsistent with other provisions herein; that is, the exercise or use of one of the provisions hereof shall not preclude the exercise or use of any other provision of this Agreement to the extent not inconsistent therewith.

## ARTICLE XIII
## ATTORNEYS AND WAIVER OF CONFLICT

**13.1** All the Initial Members acknowledge that the attorneys at EPGD Attorneys at Law, P.A. have advised said Initial Members since the inception of and just prior to the creation of the LLC, including but not limited to, the preparation of this Agreement. All initial Members agree that EPGD Attorneys at Law, P.A. will represent the interests of the LLC and not any Member, individually, when such matters involve the LLC. In the event of any litigation arising between the LLC and the Members, such Members waive any argument or issue of conflict of interest by Eric P. Gros-Dubois, EPGD Attorneys at Law, P.A., and any of the associates or partners at EPGD Attorneys at Law, P.A.

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

## ARTICLE XIV
## SPECIAL CONDITIONS

**14.1 Non-Competition & Non-Solicitation**. Each Member, for as long as he/she/it is a party to this Operating Agreement and for three (3) years after the date such Member's status as a party to this Operating Agreement is terminated (the "**Non-Compete Period**"), shall not (a) compete directly or indirectly with the LLC for the rendering of services to any person or entity that is a customer or client of the LLC at any time during the Non-Compete Period; or (b) enter into, engage in, assist, provide services to, give or lend funds to, be employed by or consult with, or have a financial or other interest in any business that competes with the LLC in such manner. During the Non-Compete Period, each Member shall not directly or indirectly induce employees, contractors, customers, clients, or suppliers of the LLC to terminate their relationship with the LLC or to engage in any business that competes with the LLC; and no Member will employ any person or contractor while such person or contractor is employed by the LLC or during the period of two (2) years after such person's or contractor's employment with the LLC is terminated for any reason; provided, however, that the foregoing shall not prevent any Member from rehiring any of such Member's former employees or contractors for any purpose other than competing with the LLC. Notwithstanding the foregoing, this Section 14.1 shall cease to have effect upon (a) the sale of Membership Interests pursuant to Section 8.3 (Tag-Along) or Section 8.4 (Drag-Along) hereof; (b) the sale of all or substantially all of the assets of the LLC; or (c) the dissolution of the LLC not in connection with the restructuring and continuance of the LLC's business.

**14.2 Confidentiality**. During the Non-Compete Period, each Member shall not disclose to any unauthorized person or use for his/her/its own account any Confidential Information without the prior written consent of the Board, unless and to the extent that such Confidential Information has become generally known to and available for use by the public other than as a result of such Member's acts or omissions; provided, however, that such restrictions on use and disclosure of Confidential Information shall remain binding upon the Members indefinitely as to Confidential Information which is, at the time of disclosure, a trade secret under applicable law. For the purposes hereof, "**Confidential Information**" means all trade secrets (as defined by applicable law) as well as other information existing as of the Effective Date or thereafter developed in which the LLC has a proprietary interest (or a confidentiality obligation to a third party) and a legitimate business reason for guarding against unauthorized disclosure thereof, including, without limitation, information in any form (oral, written, electronic, etc.) relating to business opportunities or operations, market analyses, business or project development, cost or pricing structure, financial projections, marketing, know-how, specifications, designs, software, and prototypes. Notwithstanding the foregoing, this Section 14.2 shall cease to have effect upon (a) the sale of Membership Interests pursuant to Section 8.3 (Tag-Along) or Section 8.4 (Drag-Along) hereof; (b) the sale of all or substantially all of the assets of the LLC; or (c) the dissolution of the LLC not in connection with the restructuring and continuance of the LLC's business.

**14.3 Market Stand-Off Operating Agreement.** Each Member (a) hereby agrees that such Member shall not sell or otherwise transfer or dispose of any Membership Interests (or other securities) of the LLC held by such Member (other than those included in a registration statement of the LLC filed under the applicable securities laws) for a period specified by the LLC or the representative of the underwriters of stock of the LLC not to exceed one hundred eighty (180) days following the effective date of a registration statement of the LLC filed under the applicable

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

securities laws; and (b) hereby agrees to execute and deliver such other agreements as may be reasonably requested by the LLC or the underwriter which are consistent with the foregoing or which are necessary to give further effect thereto, in each case provided that the LLC obtains comparable agreements from each director, officer and five percent (5%) or greater beneficial owner of Percentage Interests and/or Membership Voting Interests. The LLC may impose stop transfer instructions with respect to the Membership Interests (or other securities) subject to the foregoing restriction until the end of such one hundred eighty (180) day period.

**14.4 Termination**. The rights and obligations of each Member under this Operating Agreement, except those under ARTICLE XI (Indemnification), ARTICLE XV (Miscellaneous), Section 14.1 (Non-Competition & Non-Solicitation), and Section 14.2 (Confidentiality), shall terminate as to such Member upon the transfer of all Membership Interests owned by such Member in accordance with this Operating Agreement or upon the consummation of the LLC's public offering (meaning an underwritten public offering of equity securities of the LLC pursuant to an effective registration statement under the Securities Act of 1933, as amended, and the rules and regulations thereunder), except for the obligations set forth above in Section 14.3 (Market Stand-Off Agreement), which obligations shall survive such termination for one hundred eighty (180) days following the effective date of the corresponding registration statement of the LLC filed under said Securities Act.

**14.5 OFAC**. Each of the Members and Manager hereby represent, warrant, and covenant to one another and to the LLC that it/he/she (or, if such Member or Manager is a business entity, the ultimate individual beneficial owner of such entity) is not, and shall not become, a person or entity with whom any of the other members, Manager, or LLC is restricted from doing business with under regulations of the Office of Foreign Asset Control (**"OFAC"**) of the Department of the Treasury (including, but not limited to, those named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order (including, but not limited to, the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action and is not and shall not engage in any dealings or transaction or be otherwise associated with such persons or entities. In the event of a breach of the foregoing representation, warranty, and covenant by any Member, and unless otherwise agreed by majority of the remaining Members, such breaching Member's membership in the LLC shall terminate immediately. During any pending legal proceeding or governmental investigation involving or that may result in any of the foregoing causes of Involuntary Withdrawal, the subject Member's voting rights in the LLC (as well as any rights to represent or act on behalf of the LLC) may be suspended, and economic interests in the LLC may be placed in escrow, by majority vote of the remaining Members, or placed into such account, custody or other possession as required by law.

## ARTICLE XV
## GENERAL PROVISIONS

**15.1 Entire Agreement/Modification**. This Agreement contains the entire understanding of the parties with respect to the subject matter of the agreement, and it supersedes all prior understandings and agreements, whether written or oral, and all prior dealings of the parties with respect to the subject matter hereof. This Agreement, in whole or in part, cannot be changed, modified, extended, or discharged orally and no waiver of compliance with any provision

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

or condition hereof and no consent provided for herein shall be effective unless evidenced by an instrument in writing duly executed by the party against whom enforcement of any waiver, change, modification, extension, or discharge is sought. Further, no consent or waiver, express or implied, to or of any breach or default shall constitute a consent or waiver to or of any other breach.

**15.2 Partition**. Each Member agrees that he or she has no right, and irrevocably waives any and all such rights, to have the assets of the LLC partitioned, or to file a complaint, or institute and maintain any proceeding at law or equity to have the assets of the LLC partitioned.

**15.3 Further Actions**. Each of the Members agrees to execute, acknowledge, and deliver such additional documents, and take such further actions, as may reasonably be required from time to time to carry out each of the provisions and the intent of this Agreement, and every agreement or document relating hereto, or entered into in connection herewith.

**15.4 WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LEGAL ACTION ARISING OUT OF, OR RELATING TO, THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.**

**15.5 Severability**. If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

**15.6 Successor and Assigns**. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors, legal representatives, and assigns. This Agreement may not be assigned by any party without the express written consent of the other parties.

**15.7 Construction**. Throughout this Agreement, the masculine, feminine, or neuter genders shall be deemed to include the masculine, feminine, and neuter and the singular, the plural, and vice versa. The section headings of this Agreement are for convenience of reference only and do not form a part hereof and do not in any way modify, interpret, or construe the intentions of the parties.

**15.8 Execution and Counterparts**. This Agreement may be executed in several counterparts each of which shall be deemed to be an original, and all such counterparts when taken together shall constitute one and the same instrument.

**15.9 Governing Law**. This Agreement shall be governed by, and interpreted in accordance with the laws of the State of Florida. The parties hereby agree that any legal action or proceeding shall be brought in the courts of the State of Florida, in Miami Dade County. The parties further agree to submit to the jurisdiction of the State of Florida and consent to the service of process in accordance with applicable procedures and rules of said jurisdiction.

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

**15.10 Attorney's Fees**. In legal proceedings instituted to enforce this Agreement, the prevailing party (as determined by the trier of fact) shall be entitled to the award of its reasonable attorney's fees and litigation costs, plus fees and costs incurred by it in executing and/or collecting any judgment, at all trial and appellate levels.

**15.11 Opportunity to Review with Counsel**. Each Member has had an opportunity to review this Agreement with their respective advisors, accountants, and attorneys prior to execution of same.

[SIGNATURE PAGE FOLLOWS]

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

**IN WITNESS WHEREOF,** the parties hereto have caused this Operating Agreement to be duly executed as of the Effective Date.

**MEMBERS:**

A2S2 LLC, Member
By: Sheehyung Sung
Its: Manager

Sheehyung Sung, Member

Donald Lee Townsend and Cliff Dale Townsend, Member
By:

Ken Kodish, Member

Victor Valencia and Brenda Valencia, Member
By:

Lighthouse Transportation Services LLC, Member
By: Joe Myers
Its: Manager

**MANAGERS:**

Sheehyung Sung, Manager

Joe Myers, Manager

NOT ORIGINAL DOCUMENT
0/07/2020 09:33:10 AM
renzenbrink

**IN WITNESS WHEREOF**, the parties hereto have caused this Ope [illegible] be duly executed as of the Effective Date.

**MEMBERS**:

A2S2 LLC, Member
By: Sheehyung Sung
Its: Manager

Sheehyung Sung, Member

Donald Lee Townsend and Cliff Dale Townsend, Member
By:

Ken Kodish, Member

Victor Valencia and Brenda Valencia, Member
By:

Lighthouse Transportation Services LLC, Member
By: Joe Myers
Its: Manager

**MANAGERS**:

Sheehyung Sung, Manager

Joe Myers, Manager

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

**IN WITNESS WHEREOF**, the parties hereto have caused this Operating Agreement to be duly executed as of the Effective Date.

**MEMBERS**:

A2S2 LLC, Member
By: Sheehyung Sung
Its: Manager

Sheehyung Sung, Member

Donald Lee Townsend and Cliff Dale Townsend, Member
By:

Ken Kodish, Member

Victor Valencia and Brenda Valencia, Member
By:

Lighthouse Transportation Services LLC, Member
By: Joe Myers
Its: Manager

**MANAGERS**:

Sheehyung Sung, Manager

Joe Myers, Manager

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

**IN WITNESS WHEREOF,** the parties hereto have caused this Operating Agreement to be duly executed as of the Effective Date.

**MEMBERS**:

A2S2 LLC, Member
By: Sheehyung Sung
Its: Manager

Sheehyung Sung, Member

Donald Lee Townsend and Cliff Dale Townsend, Member
By:

Ken Kodish, Member

Victor Valencia and Brenda Valencia, Member
By:

Lighthouse Transportation Services LLC, Member
By: Joe Myers
Its: Manager

**MANAGERS**:

Sheehyung Sung, Manager

Joe Myers, Manager

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

## EXHIBIT A

### LIST OF MEMBERS, NUMBER OF UNITS, PERCENTAGE INTEREST, AND MEMBERSHIP VOTING INTEREST OF US MELON LLC

| Member Name | Number of Units | Percentage Interest | Membership Voting Interest |
|---|---|---|---|
| A2S2 LLC | 20 | 20% | 20% |
| Sheehyung Sung | 20 | 20% | 20% |
| Donald Lee Townsend and Cliff Dale Townsend | 5 | 5% | 5% |
| Ken Kodish | 5 | 5% | 5% |
| Victor Valencia and Brenda Valencia | 10 | 10% | 10% |
| Lighthouse Transportation Services LLC | 10 | 10 | 10 |
| **Total** | **70** | **70%** | **70%** |

***ALL MEMBERS AND MANAGERS UNDERSTAND AND AGREE THAT 30 UNITS ARE BEING HELD BY THE COMPANY AND 10 UNITS ARE BEING HELD INDIVIDUALLY BY SHEEHYUNG SUNG TO BE SOLD TO POTENTIAL INVESTORS/NEW MEMBERS AND THE PERCENTAGE AND MEMBERSHIP VOTING INTEREST IN THIS CHART SHALL BE DILUTED ACCORDINGLY. EACH NEW MEMBER SHALL SIGN A JOINDER TO THIS OPERATING AGREEMENT AND THIS CHART SHALL BE UPDATED ACCORDINGLY.**

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

**EXHIBIT B**

**CAPITAL CONTRIBUTIONS OR OTHER EQUITY**

| Member Name | Initial Capital Contribution |
|---|---|
| A2S2 LLC | $20.00 |
| Sheehyung Sung | $100,000.00 |
| Donald Lee Townsend and Cliff Dale Townsend | $25,000.00 |
| Ken Kodish | $25,000.00 |
| Victor Valencia and Brenda Valencia | $50,000.00 |
| Lighthouse Transportation Services LLC | $125,000.00 |

EXHIBIT
NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmenzenbrink

**Bell Irrigation Pipe & Supply, LLC**

1920 Meadow Brook Drive
Cairo, Georgia 39828
229-377-4901 Office
229-377-7675 Fax

# Invoice

| Date | Invoice # |
|---|---|
| 12/28/2018 | 85403 |

| Bill To | Ship To |
|---|---|
| US Melon LLC<br>2910 County Road 136<br>White Springs, Fl. 32096 | Ronald Moy Farms<br>205 HWY 62 West<br>Bowling Green,, FL. 33834<br>863-781-1041 Ronald<br>Call before Delivery |

| Cust. P.O. No. | Terms | Rep | Ship Date | Ship Via | FOB | Project |
|---|---|---|---|---|---|---|
| Erik | Net 120 | IKS | 12/28/2018 | Drop-Ship | | |

| Qty | Item | Description | Rate | | Amount |
|---|---|---|---|---|---|
| 192 | 3AGG0576 | 66" 0.9mil X 4000' Black Regular plastic | 127.08 | | 24,399.36 |
| 128 | SPF87508.... | 875-8mil .2-12 x 6000' Streamline Python | 111.00 | | 14,208.00 |
| 1 | Freight | Freight | 250.00 | | 250.00 |

Thank you for your business.

A finance charge of 1 1/2% will be accessed for all invoices over 30 days

If you have questions, please let us know, 229-377-4901.

| | |
|---|---|
| **Subtotal** | $38,857.36 |
| **Sales Tax (6.0%)** | $0.00 |
| **Total** | $38,857.36 |
| **Payments/Credits** | $0.00 |
| **Balance Due** | $38,857.36 |

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

TD Bank
America's Most Convenient Bank®

**Front of check**

SECURITY FEATURES INCLUDE TRUE WATERMARK PAPER, HEAT SENSITIVE ICON AND FOIL HOLOGRAM

US MELON LLC 08-18
9005 147TH RD
LIVE OAK, FL 32060

1044

DATE 4/15/19

PAY TO THE ORDER OF MSM Groves Inc. $ 10,000.00

Ten thousand dollars only DOLLARS

TD Bank
America's Most Convenient Bank®

FOR Growers Advance (2% / Month)

⑈001044⑈ [redacted] 065⑈

**Back of check**

SECURITY FEATURES

DO NOT CASH

COLOR INSIDE THIS BOX SHOULD BE WHITE

Chemical Wash Detection Box

ENDORSE HERE

☐ CHECK HERE IF MOBILE DEPOSIT

DO NOT WRITE, STAMP OR SIGN BELOW THIS LINE
RESERVED FOR FINANCIAL INSTITUTION USE

_title

_description

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

© 2019 TD Bank, N.A. All Rights Reserved

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

**TD Bank**
America's Most Convenient Bank®

**Front of check**




**Back of check**




_title

_description

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

© 2019 TD Bank, N.A. All Rights Reserved

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

**TD Bank**
America's Most Convenient Bank®

**Front of check**




**Back of check**




# _title

_description

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

© 2019 TD Bank, N.A. All Rights Reserved

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

**TD Bank**
America's Most Convenient Bank®

### Front of check




### Back of check




© 2019 TD Bank, N.A. All Rights Reserved

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

**TD Bank**
America's Most Convenient Bank®

**Front of check**

SECURITY FEATURES INCLUDE TRUE WATERMARK PAPER, HEAT-SENSITIVE ICON AND FOIL HOLOGRAM

US MELON LLC
9005 147TH RD
LIVE OAK, FL 32060

1066

DATE 5|13|19

PAY TO THE ORDER OF MSM Groves $ 11,114.00

Eleven thousand one hundred Forteen dollars Only DOLLARS

TD Bank
America's Most Convenient Bank®

FOR Cash advance Pick & pack

⑈001066⑈ [redacted] 065⑈

**Back of check**

0210 05/13/2019

COLOR INSIDE THIS BOX SHOULD BE WHITE

Chemical Wash Detection Box

ENDORSE HERE

X MSM Groves

☐ CHECK HERE IF MOBILE DEPOSIT

DO NOT WRITE, STAMP OR SIGN BELOW THIS LINE
RESERVED FOR FINANCIAL INSTITUTION USE

_title

_description

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

© 2019 TD Bank, N.A. All Rights Reserved

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

TD Bank

# Domestic Wire Transfer

*Initiator:* *Cynthia D Robinson* *Date:* *05/17/2019*
*Initiator's Ph #*:* *(386) 364-5528* *Reference Number:* *0937*

Approver's Name : John L Burley Wire Status: Pending Branch Approval

| Wire Amount | Customer's Bank Code | Branch Bank Code | Branch # |
|---|---|---|---|
| $22,568.00 | 004-TD BANK N.A. | 004-TD BANK N.A. | 283 |

**Same Day Deposit?**
No

| Wire Type | | Account Type |
|---|---|---|
| Wire Transfer | ☐ Check if Federal Tax Payment | Business |

## ORIGINATOR

| Customer Name | Customer Account Number |
|---|---|
| Us Melon Llc | [redacted]65 |

| Beneficiary Name | Beneficiary Account Number |
|---|---|
| Msm Groves Inc | [redacted]214 |
| **Beneficiary Address 1** | **Beneficiary Address 2** |
| 205 State Rd 62 | |
| **Beneficiary City** | **Beneficiary State / Zip Code** |
| Bowling Green | FL 33834 |
| **ABA Number** | **Receiving Bank Name** |
| [redacted]27 | WAUCHULA STATE BANK |

## SPECIAL INSTRUCTIONS

**Further Credit Bank Name**

**Further Credit Comments (Max 140 Characters)**

| CUSTOMER REQUESTING | APPROVED BY |
|---|---|
| (Signature) | (Signature) |

Us Melon Llc

**Notices & Disclaimers:** Placeholder for disclaimer

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

**Date: 05/22/2019 15:42:03** **US Melon** Page: 1

**Detailed Aged Accounts Payable Report for Vendors [MSM01] to [MSM01]**

| INVOICE # | | DATE | P.O. # | TOTAL | 0 - 19 DAYS | 20 - 29 DAYS | 30 - 39 DAYS | 40 - 49 DAYS | Over 50 DAYS |
|---|---|---|---|---|---|---|---|---|---|
| **MSM01 - Ronald Moye - MSM Groves -- Cred. Lim.:0 -- -- Fax:** | | | | | | | | | |
| 10019 C | 20 | 05/02/2019 | | | [redacted] | [redacted] | | | |
| 10026 B | 19 | 05/03/2019 | 100113 | | [redacted] | [redacted] | | | |
| 10030 B | 15 | 05/07/2019 | 100116 | | [redacted] | [redacted] | | | |
| 10041 B | 6 | 05/16/2019 | | | [redacted] | [redacted] | | | |
| 10043 B | 10 | 05/12/2019 | | | [redacted] | [redacted] | | | |
| 10046 B | 5 | 05/17/2019 | | | [redacted] | [redacted] | | | |
| 10048 B | 4 | 05/18/2019 | | | [redacted] | [redacted] | | | |
| 10049 B | 5 | 05/17/2019 | | | [redacted] | [redacted] | | | |
| 10056 B | 3 | 05/19/2019 | | | [redacted] | [redacted] | | | |
| 10060 B | 2 | 05/20/2019 | | | [redacted] | [redacted] | | | |
| 10066 B | 14 | 05/08/2019 | 034280 | | [redacted] | [redacted] | | | |
| 10069 B | 14 | 05/08/2019 | | | [redacted] | [redacted] | | | |
| 10070 B | 13 | 05/09/2019 | 191719 | | [redacted] | [redacted] | | | |
| 10071 B | 14 | 05/08/2019 | | | [redacted] | [redacted] | | | |
| 10073 B | 12 | 05/10/2019 | | | [redacted] | [redacted] | | | |
| 10080 B | 7 | 05/15/2019 | | | [redacted] | [redacted] | | | |
| 10081 B | 7 | 05/15/2019 | | | [redacted] | [redacted] | | | |
| 10083 B | 6 | 05/16/2019 | | | [redacted] | [redacted] | | | |
| 10084 B | 7 | 05/15/2019 | | | [redacted] | [redacted] | | | |
| 10088 B | 2 | 05/20/2019 | | | [redacted] | [redacted] | | | |
| 10090 B | 2 | 05/20/2019 | | | [redacted] | [redacted] | | | |
| ADVMOY A | 33 | 04/19/2019 | | | [redacted] | [redacted] | [redacted] | | |
| ADVMOY C | 33 | 04/19/2019 | | | [redacted] | [redacted] | [redacted] | | |
| ADVMOY E | 53 | 03/30/2019 | | | [redacted] | [redacted] | | | [redacted] |
| ADVMOY G | 22 | 04/30/2019 | | | [redacted] | [redacted] | | | |
| ADVMOY J | 14 | 05/08/2019 | | | [redacted] | [redacted] | | | |
| ADVMOY M | 28 | 04/24/2019 | | | [redacted] | [redacted] | | | |
| ADVMOY N | 26 | 04/26/2019 | | | [redacted] | [redacted] | | | |
| ADVMOY P | 8 | 05/14/2019 | | | [redacted] | [redacted] | | | |
| Total for 1 Cust.: | | | | [redacted] | | | | | |

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

**Date: 05/22/2019 15:06:16** **US Melon** **Page: 1**

**Detailed Aged Accounts Receivable Report for Customers [MSM01 ] to [MSM01 ]**

| INVOICE # | DATE | P.O. # | TOTAL | 0 - 19 DAYS | 20 - 29 DAYS | 30 - 39 DAYS | 40 - 49 DAYS | Over 50 DAYS |
|---|---|---|---|---|---|---|---|---|
| **MSM01 - Ronald Moye - MSM Groves -- Cred. Lim :0 -- -- Fax:** | | | | | | | | |
| 10031 A 16 | 05/06/2019 | | | [redacted] | | | | |
| 10067 A 14 | 05/08/2019 | 10067 | | | | | | |
| 10068 A 14 | 05/08/2019 | 10068 | | | | | | |

Total for 1Cust.: [redacted]

NOT ORIGINAL DOCUMENT
10/07/2020 09:53:10 AM
lmrenzenbrink

# INVOICE

SEEDWAY

SEEDWAY LLC P.O. BOX 250 HALL, NY

**SHIP TO:** US MELON LLC
RONALD MOY
205 HWY 62 WEST
386*590-0935
BOWLING GREEN FL 33834

| | |
|---|---|
| Page | 1 of 1 |
| Due Date | 07/28/19 |
| Customer No. | 215415 |
| Invoice No. | 1455903 |
| Invoice Date | 03/30/19 |
| Order Number | 8076 SD |
| Branch/Plant | 595 |
| **PLEASE INDICATE AMOUNT ENCLOSED** | |

**BILL TO:**
US MELON LLC
9005 147TH ROAD
LIVE OAK FL 32060

**PLEASE SEND REMITTANCE TO:**

SEEDWAY LLC
P.O. BOX 250
HALL, NY 14463-0250

DETACH HERE — PLEASE RETURN THIS UPPER PORTION WITH YOUR PAYMENT — DETACH HERE

**Please Direct Invoice Inquiries To: 800-836-3710**

| Requested Date | Customer P.O. | F.O.B. | Ship Inst. |
|---|---|---|---|
| 02/10/2019 | RON MOY | Blank Freight Code | |

| Lot No. | Description | Item Number | UM | Qty Shipped | Price | Extended Price |
|---|---|---|---|---|---|---|
| 14506452 | WMELON MELODY F1 W/ SP-7 | 5030OKDEUCES | M | 145.00 | 438.0000 | [redacted] |
| 14506458 | WMELON CAPTIVATION F1 W/ SP-7 | 8852OKDEUCES | M | 145.00 | 400.0000 | [redacted] |
| 14506458 | WMELON CAPTIVATION F1 NO CHARGE PLANTS | 8852OKDEUCES | M | 1.54 | 0.0000 | [redacted] |
| 14506452 | WMELON MELODY F1 NO CHARGE PLANTS | 5030OKDEUCES | M | 0.88 | 0.0000 | [redacted] |
| | Freight/Fuel Surcharge | FREIGHT | | 1.00 | 1345.0000 | [redacted] |
| | | | | | **Sales Tax** | [redacted] |
| | | | | | **Total** | [redacted] |

**LIMITED ONE YEAR WARRANTY NOTICE TO BUYER:**
SEEDWAY WARRANTS FOR ONE YEAR FROM THE DATE OF SALE THAT THE SEEDS AND PLANTS SOLD CONFORM TO THE LABEL DESCRIPTION, AS REQUIRED BY STATE AND FEDERAL SEED LAWS. SEEDWAY MAKES NO OTHER WARRANTIES, EXPRESS OR IMPLIED, OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR OTHERWISE,WHICH EXTEND BEYOND THE LABEL DESCRIPTION,LIABILITY FOR DAMAGES FROM ANY CAUSE, INCLUDING BUT NOT LIMITED TO, BREACH OF WARRANTY OR NEGLIGENCE,WITH RESPECT TO SUCH SEEDS OR PLANTS IS LIMITED TO A REFUND OF THE PURCHASE PRICE. THIS REMEDY IS EXCLUSIVE, SHOULD PURCHASER WISH TO OBTAIN DIFFERENT RIGHTS THAN SET FORTH HEREIN, IT MAY NEGOTIATE WITH SEEDWAY TO OBTAIN SUCH ADDITIONAL RIGHTS AT AN INCREASE IN THE PURCHASE PRICE OF THE SEEDS OR PLANTS. IN NO EVENT SHALL SEEDWAY BE LIABLE FOR ANY INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES, INCLUDING BUT NOT LIMITED TO, LOSS OF PROFITS, ANY CONTROVERSY OR CLAIM ARISING OUT OF THIS SALE SHALL BE SETTLED BY ARBITRATION IN SYRACUSE, NEW YORK, IN ACCORDANCE WITH THE RULES OF THE AMERICAN ARBITRATION ASSOCIATION AND THE DECISION OF THE ARBITRATORS SHALL BE FINAL AND BINDING UPON BOTH PARTIES, AND ANY JUDGMENT UPON ANY AWARD RENDERED MAY BE ENTERED IN ANY COURT HAVING COMPETENT JURISDICTION. ANY ARBITRATION PROCEEDING OR OTHER CLAIM MUST BE BROUGHT IN CONNECTION WITH THIS TRANSACTION WITHIN ONE (1) YEAR AFTER THE GOODS ARE SOLD. THIS AGREEMENT SHALL BE INTERPRETED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK. THESE TERMS SHALL NOT BE MODIFIED OR AMENDED EXCEPT IN WRITING, SIGNED BY BOTH PARTIES, UPON THIRTY (30) DAYS NOTICE BY REGULAR MAIL. BY ACCEPTANCE OF THE SEEDS OR PLANTS, PURCHASER ACKNOWLEDGES THE TERMS OF THIS LIMITED WARRANTY AND LIMITATION ON DAMAGES AND REMEDY. THE TERMS OF THIS LIMITED WARRANTY CONSTITUTE THE ENTIRE AGREEMENT BETWEEN THE PARTIES REGARDING THE SALE OF SEEDS OR PLANTS.

PLEASE INCLUDE YOUR CUST# ON ALL REMITTANCES. YOU MAY HAVE PREPAID THIS INVOICE, IT IS OUR POLICY TO SEND COPIES OF INVOICES FOR ALL SHIPMENTS. IF YOU HAVE PREPAID, PLEASE KEEP THIS INVOICE FOR YOUR RECORDS.

SEEDWAY

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:16 AM
lmrenzenbrink

# INVOICE

SEEDWAY

SEEDWAY LLC P.O. BOX 250 HALL, NY

| | |
|---|---|
| Page | 1 of 1 |
| Due Date | 08/20/19 |
| Customer No. | 215415 |
| Invoice No. | 1467498 |
| Invoice Date | 04/22/19 |
| Order Number | 831931 SO |
| Branch/Plant | 610 |
| **PLEASE INDICATE AMOUNT ENCLOSED** | |

**SHIP TO:**
US MELON LLC
RONALD MOY
205 HWY 62 WEST
386*590-0935
BOWLING GREEN FL 33834

**BILL TO:**
US MELON LLC
9005 147TH ROAD
LIVE OAK FL 32060

**PLEASE SEND REMITTANCE TO:**

SEEDWAY LLC
P.O. BOX 250
HALL, NY 14463-0250

DETACH HERE PLEASE RETURN THIS UPPER PORTION WITH YOUR PAYMENT DETACH HERE

**Please Direct Invoice Inquiries To: 800-836-3710**

| Requested Date | Customer P.O. | F.O.B. | Ship Inst. |
|---|---|---|---|
| 03/07/2019 | RON MOY | Blank Freight Code | |

| Lot No. | Description | Item Number | UM | Qty Shipped | Price | Extended Price |
|---|---|---|---|---|---|---|
| 13794/01 | WMELON 720 F1 242 CELL | SL7836OA | M | 40.00 | 189.0000 | 7,560.00 |
| 13794/01 | WMELON 720 F1 242 CELL | SL7836OA | M | 4.84 | 189.0000 | 914.76 |
| | FREIGHT | FREIGHT | | 1.00 | 680.0000 | 680.00 |
| | | | | | **Sales Tax** | $640.83 |
| | | | | | **Total** | $9,795.59 |

**LIMITED ONE YEAR WARRANTY NOTICE TO BUYER:**
SEEDWAY WARRANTS FOR ONE YEAR FROM THE DATE OF SALE THAT THE SEEDS AND PLANTS SOLD CONFORM TO THE LABEL DESCRIPTION, AS REQUIRED BY STATE AND FEDERAL SEED LAWS. SEEDWAY MAKES NO OTHER WARRANTIES, EXPRESS OR IMPLIED, OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR OTHERWISE,WHICH EXTEND BEYOND THE LABEL DESCRIPTION,LIABILITY FOR DAMAGES FROM ANY CAUSE, INCLUDING BUT NOT LIMITED TO, BREACH OF WARRANTY OR NEGLIGENCE,WITH RESPECT TO SUCH SEEDS OR PLANTS IS LIMITED TO A REFUND OF THE PURCHASE PRICE. THIS REMEDY IS EXCLUSIVE, SHOULD PURCHASER WISH TO OBTAIN DIFFERENT RIGHTS THAN SET FORTH HEREIN, IT MAY NEGOTIATE WITH SEEDWAY TO OBTAIN SUCH ADDITIONAL RIGHTS AT AN INCREASE IN THE PURCHASE PRICE OF THE SEEDS OR PLANTS. IN NO EVENT SHALL SEEDWAY BE LIABLE FOR ANY INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES, INCLUDING BUT NOT LIMITED TO, LOSS OF PROFITS, ANY CONTROVERSY OR CLAIM ARISING OUT OF THIS SALE SHALL BE SETTLED BY ARBITRATION IN SYRACUSE, NEW YORK, IN ACCORDANCE WITH THE RULES OF THE AMERICAN ARBITRATION ASSOCIATION AND THE DECISION OF THE ARBITRATORS SHALL BE FINAL AND BINDING UPON BOTH PARTIES, AND ANY JUDGMENT UPON ANY AWARD RENDERED MAY BE ENTERED IN ANY COURT HAVING COMPETENT JURISDICTION. ANY ARBITRATION PROCEEDING OR OTHER CLAIM MUST BE BROUGHT IN CONNECTION WITH THIS TRANSACTION WITHIN ONE (1) YEAR AFTER THE GOODS ARE SOLD. THIS AGREEMENT SHALL BE INTERPRETED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK. THESE TERMS SHALL NOT BE MODIFIED OR AMENDED EXCEPT IN WRITING, SIGNED BY BOTH PARTIES, UPON THIRTY (30) DAYS NOTICE BY REGULAR MAIL. BY ACCEPTANCE OF THE SEEDS OR PLANTS, PURCHASER ACKNOWLEDGES THE TERMS OF THIS LIMITED WARRANTY AND LIMITATION ON DAMAGES AND REMEDY. THE TERMS OF THIS LIMITED WARRANTY CONSTITUTE THE ENTIRE AGREEMENT BETWEEN THE PARTIES REGARDING THE SALE OF SEEDS OR PLANTS.

PLEASE INCLUDE YOUR CUST# ON ALL REMITTANCES. YOU MAY HAVE PREPAID THIS INVOICE, IT IS OUR POLICY TO SEND COPIES OF INVOICES FOR ALL SHIPMENTS. IF YOU HAVE PREPAID, PLEASE KEEP THIS INVOICE FOR YOUR RECORDS.

SEEDWAY

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

USMELON
POWERED BY AMERICAN FARMERS

# INVOICE

| FROM | BILL TO |
|---|---|
| US MELON LLC | MSM Groves Inc |
| 9005 147th Road | Ronald Moye |
| Live Oak, FL 32060 | 205 State Rd 65 |
| office@usmelon.com | Bowling Green, FL 33834 |
| www.usmelon.com | P) 863.781.1041 |

| INVOICE # | DATE | TOTAL DUE | DUE DATE | TERMS | ENCLOSED |
|---|---|---|---|---|---|
| Advance 01 | 05/23/2019 | [redacted] | 05/23/2019 | Due on receipt | |

| DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|
| Grower Investment \| Bell Irrigation Pipes and Plastics (Inv 85403) | 1 | [redacted] | |
| Grower Investment \| Bell Irrigation - 9% Finance Charge (Email on May 20th) | 1 | | |
| Grower Investment \| SeedWay -Watermelon Seeds (Inv 1455903) | 1 | | |
| Grower Investment \| SeedWay - Watermelon Seeds (Inv 1467498) | 1 | | |
| Grower Investment \| Sostena Inc (Inv DS1743Final) | 1 | | |
| Grower Investment \| Seeding Inc (SO1743) | 1 | | |
| Grower Investment \| PCA - Watermelon Bins and Cap (Inv 0289953-IN) | 1 | | |
| Grower Investment \| UCC and Tax | 1 | | |
| Grower Investment \| R&D Label, LLC (Inv 2578) | 1 | | |
| Grower Investment \| Broward Paper (Inv 586604) | 1 | | |
| Grower Investment \| Sanchez Pallets | 1 | | |
| Grower Investment \| Sanchez Pallets | 1 | | |
| Grower Investment \| Sanchez Pallets | 1 | | |
| Grower Investment \| Shipping for the Pallets | 1 | | |
| Grower Investment \| FL Mid Portalbe Toliet (PT49662) | 1 | | |

*P.A.C.A TRUST PROVISION APPLY*

The perishable agricultural commodities listed on this invoice are sold subject to the statutory trust authorized by section 5 (c) of the perishable agricultural commodities act, 1930 (7 U.S.C. 499e (c) ). The seller of these commodities retains a trust claim over these commodities, all inventories of food or other products derived from these commodities, and any receivables or proceeds from the sale of these commodities until full payment is received.

Interest at 1.5% / month added to unpaid balance. Buyer agrees to pay pre-judgment interest and attorney fees incurred to collect any balance due hereunder. Pre-judgment and attorney fees shall be considered sums owing in connection with this transaction under the PACA trust.

NOT ORIGINAL DOCUMENT
10/07/2020 09:33:10 AM
bmrenzenbrink

| | | | |
|---|---|---|---|
| Grower Investment | Shipping - Rejection Inv 10066 | 1 | [redacted] |
| Grower Investment | International Paper Company Bins and Lids (Inv 384132508) | 1 | [redacted] |
| Grower Investment | Cash Advance (04/15/19) Check 1044 | 1 | [redacted] |
| Grower Investment | Cash Advance (04/23/19) Check 1052 | 1 | [redacted] |
| Grower Investment | Cash Advance (05/01/19) Check 1058 | 1 | [redacted] |
| Grower Investment | Cash Advance (05/07/19) Check 1060 | 1 | [redacted] |
| Grower Investment | Cash Advance (05/11/19) Check 1066 | 1 | [redacted] |
| Grower Investment | Cash Advance (05/17/19) Wire | 1 | [redacted] |
| Grower Investment | Wire and Postage | 1 | [redacted] |
| Grower Investment | 2% Finance Fee for the Cash Advance | 1 | [redacted] |

Wire Information:

BALANCE DUE [redacted]

Bank: TD Bank
Bank Address:
535 Ohio Ave S, Live Oak, FL 32064
Bank Phone: (386) 364-5528

ABA Code: 031101266
Routing Number: 067014822
Account No: 435-6305065

US Melon LLC address:
9005 147TH RD LIVE OAK FL 32060
US melon Phone: 773-968-6768

*P.A.C.A TRUST PROVISION APPLY*

The perishable agricultural commodities listed on this invoice are sold subject to the statutory trust authorized by section 5 (c) of the perishable agricultural commodities act, 1930 (7 U.S.C. 499e (c) ). The seller of these commodities retains a trust claim over these commodities, all inventories of food or other products derived from these commodities, and any receivables or proceeds from the sale of these commodities until full payment is received.

Interest at 1.5% / month added to unpaid balance. Buyer agrees to pay pre-judgment interest and attorney fees incurred to collect any balance due hereunder. Pre-judgment and attorney fees shall be considered sums owing in connection with this transaction under the PACA trust.